CIRCA LIMITED, a Pennsylvania corporation, for the use and benefit of Circa Limited, the Barness Organization, William and Bernice Sawyer, a Florida Joint Venture, the Odessa, Ltd., a Florida limited partnership, Plaintiffs–Appellees,

v.

CITY OF MIAMI, a Florida municipal corporation, Defendant–Appellant.

No. 93–5360.

United States Court of Appeals, Eleventh Circuit.

April 9, 1996.

A. Quinn Jones, City Atty., Theresa L. Girten, Assistant City Atty., Arthur J. England, Charles M. Auslander, Greenberg, Traurig, Hoffman, Lipoff, Rosen and Quentel, P.A., Miami, FL, for appellant.

Charles C. Kline, White & Case, Eric S. Roth, Miami, FL, for Circa and Odessa.

Before EDMONDSON and DUBINA, Circuit Judges, and CUDAHY *, Senior Circuit Judge.

CUDAHY, Senior Circuit Judge:

This litigation arises from a failed attempt by public and private entities to cooperate in the redevelopment of Overtown, an economically depressed area of downtown Miami. When the redevelopment project fell through, the private entities, Circa, Ltd., Odessa, Ltd. and their associated enterprises, sued the City of Miami, claiming breaches of contract and violations of their constitutional rights under 42 U.S.C. § 1983. A jury

* Honorable Richard D. Cudahy, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

awarded $3.1 million to Odessa and Circa: $2.6 million to Odessa on its contract claim and $500,000 to Circa on its § 1983 claim. In its appeal, the City challenges both of these awards. It argues that Circa does not have a viable claim under § 1983 because it did not have any constitutionally protected rights arising out of the redevelopment project; and the City argues that improper jury instructions and insufficient evidence undermined the jury's verdict on Odessa's contract claim.

## Background

Through the Community Redevelopment Act (CRA), Fla.Stat. §§ 163.330–163.450, Florida state law gives local governments broad authority to undertake redevelopment projects for impoverished neighborhoods. The CRA provides counties and municipalities with the power to formulate plans for redevelopment and to execute contracts with private entities to implement those plans. The CRA also specifies a minimum procedure for exercising these powers.

Pursuant to the CRA and its own municipal law, the City solicited redevelopment plans for Overtown from a variety of parties, including a group comprised of Circa, Ltd., the Barness Organization and William and Bernice Sawyer (collectively CBS). CBS proposed the construction of moderate income housing and retail properties on several parcels of land to which the City claimed title. In 1985, the City approved CBS's proposal and directed the City Manager to begin negotiations for a development agreement that would be submitted to the City Commission for final approval. Under the CRA, the City Commission's final approval was essential for the completion of the redevelopment agreement.

These negotiations did not progress smoothly. As a prerequisite to the completion of a development agreement, the City required CBS to obtain firm commitments for project financing. When CBS's initial financing plan collapsed, the City gave it some assistance in finding new sources of capital; but financial backing for the entire project was difficult to assemble. Eventually, CBS and the City decided to proceed with the project in piecemeal fashion. CBS found a lender who promised to provide the money for the development of one of the parcels, and it created a new entity, Odessa, Ltd., which would be designated as the developer for that parcel. The City Commission approved and executed a development agreement with Odessa and gave Odessa a 99-year lease on the land.

Despite the completion of this agreement, Odessa never completed the development of the parcel. The prospective lender for this phase of the project backed out and was replaced by the Puller Mortgage Company which made its loan contingent on proof that the City had clear title to the land that it was leasing to Odessa. Puller also wanted proof that the City would make its own contribution to project financing. Although the City had such proof available, it did not furnish it in time to meet Puller's deadline in 1988. Puller then withdrew its commitment, and Odessa was left without sufficient financing. Odessa continued to look for money, but city officials deemed its efforts unsatisfactory. In 1990, the City Commission terminated the development agreement and the lease with Odessa, and it also terminated its approval of CBS's entire redevelopment proposal.

The constituent entities of CBS sued the City, bringing several claims. Two of them concern us here. Circa claimed that the City had violated § 1983 when it terminated its approval of the entire redevelopment proposal. According to Circa, a combination of the CRA and Miami ordinances operated to give it a property right as soon as the City had approved it as a developer; and Circa argued that the City's abrupt termination of that approval in 1990 effected a deprivation of its property right without due process. Odessa claimed that the City had breached its lease and development agreement in a number of different ways.

Throughout the litigation, the City tried to convince the district court that, as a matter of law, Circa could not maintain its § 1983 claim. First moving for summary judgment and later moving for judgment as a matter of law, the City argued that acceptance of a developer's proposal under the CRA could not create a property right in the developer.

In the City's view, a developer did not have a property right until it obtained a lease as a result of a completed development agreement. The City also moved for a directed verdict and for judgment as a matter of law on Odessa's contract claim, arguing that there was not enough evidence to sustain it. The court denied all of these motions, submitting the § 1983 claims and the contract claims to the jury. The jury found that the City had breached Odessa's lease, and it awarded $2.6 million in damages to Odessa. It also found that the City had deprived Circa of a property right without due process by terminating its approval of Circa's proposal. It awarded Circa $500,000 as a result of this finding.

### Discussion

The City argues that Circa did not have a property right and, therefore, did not have a viable claim under § 1983. On the basis of this argument, the City believes that it is entitled to judgment as a matter of law on Circa's § 1983 claim.

The City also attacks the jury's verdict for Odessa on its contract claims. The City maintains that the judgment for Odessa on its contract claim cannot stand because the underlying verdict was not supported by substantial evidence. Alternatively, the City contends that the district court "polluted" all of the jury instructions on all of the claims when, as part of its charge on the § 1983 claim, it asked the jury to decide whether the Circa group had a property right. According to the City, the jury's attempt to answer this question of law would have confused its deliberations to such an extent that it could not properly consider any other issues in the trial. Therefore, the City contends that it deserved a directed verdict or judgment as a matter of law in its favor on Odessa's contract claim.

### *Circa's § 1983 Claim*

To state a viable claim under § 1983, a plaintiff must allege a violation of a federal right by a person acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). In its claim, Circa invoked only one federal right—the right to be free from deprivations of property without due process of law. The existence of a property right is determined not by federal law, but by existing rules or understandings such as state law. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

The district court ruled that the CRA in combination with provisions of the City's Charter gave Circa a property right once the City Commission formally approved its redevelopment proposal. If the district court erred in its interpretation of the CRA and the Charter, then Circa's claim is invalid, and the City is entitled to judgment. *See Marine One, Inc. v. Manatee County,* 877 F.2d 892, 894 (11th Cir.1989). We will subject the district court's reading of the CRA and the Charter to *de novo* review. *See id.*

This is not the first time that we have considered whether the CRA creates a property right in a developer whose proposal is approved by a local government. *See Key West Harbour Dev. Corp. v. City of Key West,* 987 F.2d 723 (11th Cir.1993). In that case we held that the CRA's minimum procedures for creating development projects do not, in themselves, create any property rights. *Id.* at 728–29. Those procedures specify the broad outlines of a local government's power to administer redevelopment projects. When a local government wants to undertake a redevelopment project, it must create a "community redevelopment agency," which may be a specially created agency or a branch of the local government itself. Fla. Stat. §§ 163.356, 163.357. The agency has the power to carry out the purposes of the CRA, but the local government itself retains the ultimate authority for approving and modifying the redevelopment plan. Fla.Stat. § 163.358(2). Therefore, the agency may solicit and select proposals for redevelopment plans, but the agency may not implement those proposals until the local government gives its final approval to the proposed plan. The CRA requires that this final approval come after a public hearing. Fla.Stat. § 163.360. These steps are all antecedent to the execution of a development agreement. Under the terms of the CRA, the completed

development agreement is an essential prerequisite to a developer's acquisition of property rights. A local government cannot give property rights, such as leases, to developers until the redevelopment plan is implemented; and the local government cannot implement the plan until the development agreement has been executed. *See Key West Harbour*, 987 F.2d at 728–29 (relying on *Striton Properties, Inc. v. City of Jacksonville Beach*, 533 So.2d 1174 (Fla.Dist.Ct.App.1988)).

The *Key West Harbour* court went on to note that a developer might not always acquire a property interest even when a development agreement with the city had been fully executed. *Key West Harbour*, 987 F.2d at 729–30 (noting that the development agreement between Key West and a developer specifically provided that the completed agreement itself did not create any property rights in the developer). In the case before us, of course, no development agreement between Miami and Circa has been executed. Under these circumstances, we do not even reach the issue whether an *agreement* creates a property interest. *Key West Harbour* clearly indicates that the procedures required by the CRA, without reference to a subsequent agreement, do not create such an interest. *See id.* at 729; *see also Striton Properties*, 533 So.2d at 1178. The *Key West Harbour* court's treatment of the CRA is controlling, and we need not consider the specific provisions of the development agreement that were entered into in that case.

In deciding that Circa did have a property right, the district court did not, however, look only to the CRA as a source of Circa's rights. The court concluded that the terms of the City's Charter limited the City's power and discretion to control the terms of the redevelopment plan. As the court saw the matter, the City's own rules compelled it to execute a development agreement with Circa once it had approved Circa's proposal. The district court thought that this self-compulsion gave Circa a property right as soon as its proposal was approved. It found an analogy between this case and *Pataula Elec. Membership Corp. v. Whitworth*, 951 F.2d 1238 (11th Cir.), *cert. denied* 506 U.S. 907, 113 S.Ct. 302, 121 L.Ed.2d 225 (1992). There we held that,

when a public entity awards contracts through a competitive bidding process, the lowest bidder for a contract has a property right as soon as the public entity accepts its bid. Under applicable state law, the entity has no discretion to award the contract to anyone but the lowest bidder. *Id.* at 1240–44. Therefore, acceptance of the bid reduces all subsequent decisions by the entity to ministerial ones. According to the district court here, once the City had approved a developer's proposal, the City Charter mandated the completion of a development agreement.

■ The parties here debate whether *Key West Harbour* or *Pataula* controls their case. The outcome of this debate—and the viability of Circa's § 1983 claim—depend upon how the municipal law limits the discretion of the City Commission with respect to the completion of development agreements under the CRA. We conclude that the City's Charter does not substantially limit the range of official discretion provided by the CRA. Section 29–A(c) of the Charter describes the limits of official discretion in reviewing proposals for redevelopment projects and in negotiating and executing contracts for those projects. Circa suggests that this section of the Charter creates a facsimile of the competitive bidding process that was important to this court's decision in *Pataula*. According to Circa, whenever the exercise of official discretion is limited by objectively defined considerations, that exercise has the essential components of a competitive bidding process. This is a questionable analysis, but, even if it is correct, it does not make Circa's case. As Circa points out, § 29–A(c) does impose some objectively defined limitations on official discretion to solicit and review redevelopment proposals. The City Manager must insure that all proposals are analyzed by a certified public accounting firm and evaluated by an independent review committee. Moreover, the City Manager must consider these analyses and evaluations when making his own recommendation to the City Commission. But this is where the meaningful limits on official discretion end. The City Commission, which has the ultimate authority for selecting proposals and for executing contracts, may accept or reject the City Manager's recommendations. Indeed, the Commis-

sion need not accept any proposal or execute any contract at all. And, in making its decisions about contracts and proposals, the Commission must only consider what is "most advantageous to the city." City of Miami Charter and Code, § 29–A(c). Given these provisions of the Charter, it is clear that the City Commission's final decisions about the selection of proposals or the execution of contracts are hardly constrained by any objective considerations. It is fair to say that its decision-making about redevelopment projects is fully discretionary.

In any event, and after carefully considering *Pataula*, we believe that the theory of Circa's constitutional claim presents problems if applied too broadly to bidding on government contracts. Essentially, the theory attempts to elevate what might have matured into a contract claim (had the development agreement and lease actually been completed) into a claim based on a constitutional deprivation. Although this seems to be the pattern of *Pataula*, we are reluctant, without careful analysis, to extend such a theory as an approach of general application to government contracting disputes.

Circa's due process claim here appears to be both substantive and procedural. The complaint alleges that "CBS and Odessa's property rights [were revoked] without proper notice and hearing" and that these rights were revoked "arbitrarily and capriciously ... without substantial evidence or just cause." The first of these standards is procedural and the second substantive. Whether either the procedural or the substantive allegation is routinely applicable to the breakdown of an everyday government contract negotiation is questionable. For example, when does a party to a contract negotiation have a right to notice and hearing if the other party refuses to go forward with the contract? Or when is one party's refusal to go forward with a contract sufficiently "arbitrary and capricious" or "unjust" to form the basis of a constitutional lawsuit? Since *Pataula* does not govern here, we need not answer these questions. But they are diffi-

cult ones in the context of contract negotiations between private and public entities.

The *Pataula* court held that the disappointment inflicted on a rejected bidder for a government contract can give rise to a constitutional claim when it results from the arbitrary action of a government official. *See Pataula*, 951 F.2d at 1243. This, of course, is the language of substantive due process, and Circa uses similar language in the substantive branch of its due process claim here. But the City correctly points out that, according to the logic of Circa's approach, it would seem to have more high-powered rights (a constitutional claim) if it has not yet acquired a contract claim than if (as does Odessa) it has a straight-forward contract right.

We believe that a due process theory is questionable if it is simply used to plug a gap in a potential contract claim by recourse to the Constitution. The *Pataula* court cited two cases to support application of a constitutional theory in that case. *See Pataula*, 951 F.2d at 1242 (relying on *Metric Constructors, Inc. v. Gwinnett County, Ga.*, 729 F.Supp. 101 (N.D.Ga.1990) and *Hilton Constr. Co. v. Rockdale County Bd. of Educ.*, 245 Ga. 533, 266 S.E.2d 157 (1980)). Unfortunately, these authorities do not seem to provide a compelling basis for a constitutional claim. In *Metric Constructors*, the district court held that a disappointed bidder may have a property interest only if state law explicitly defines one, and it cited *Hilton* for the proposition that Georgia recognized a property interest for disappointed bidders. *Metric Constructors*, 729 F.Supp. at 102. The *Hilton* case, however, does not seem to find or support a property interest, despite the interpretations of the *Metric Constructors* or *Pataula* courts. In *Hilton*, the Georgia Supreme Court held that Georgia's competitive bidding procedures gave a bidder a "legally protected interest" sufficient to give it *standing* to challenge a government agency's adherence to those procedures. *Hilton*, 245 Ga. at 538, 266 S.E.2d at 161. Hence *Hilton* is about statutory interests and the "zone of interests" test for standing to challenge administrative action.[1] *See id.* (citing *Associa-*

---

1. The case also holds that, under competitive bidding procedures, a school board may not re-

ject a low bid on the grounds that the plaintiff is "unknown."

*tion of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)).

*Pataula* is not the only source for the theory espoused here, but the other cases that have advanced it do not resolve our questions about it. The theory seems to have its origins in *Three Rivers Cablevision v. City of Pittsburgh,* 502 F.Supp. 1118 (W.D.Pa.1980). The district court in *Three Rivers Cablevision* approached the problem as one of *procedural* due process and found a property right to have a cable television franchise awarded in accordance with a city ordinance and a request for bids. According to the complaint there, a "materially deficient" proposal won the franchise based on "arbitrary, capricious, unlawful and irrelevant" considerations. *Id.* at 1127. And in its opinion, the district court said "the due process to which one possessing the protected interest was entitled was the non-arbitrary exercise by the city of its discretion in making the award." *Id.* at 1131. This is ordinarily the language of substantive due process.

Some cases in this circuit have acknowledged *Three Rivers Cablevision,* but they have attempted to limit it to its facts. Thus, these cases have only allowed disappointed bidders to maintain § 1983 claims when the facts of a case present (1) a regulated bidding procedure, (2) material compliance with the procedure by the disappointed bidder, and (3) material and significant noncompliance with the procedure by the successful bidder. *Douglas N. Higgins, Inc. v. Florida Keys Aqueduct Auth.,* 565 F.Supp. 126, 128–29 (S.D.Fla.1983); *Kendrick v. City Council of Augusta, Ga.,* 516 F.Supp. 1134, 1139 (S.D.Ga.1981). Another district court in this circuit has criticized *Three Rivers Cablevision* and its theory. *Urban Sanitation Corp. v. City of Pell City, Ala.,* 662 F.Supp. 1041, 1046 (N.D.Ala.1986). *Urban Sanitation Corp.,* incidentally, regards an unsuccessful bidder's claim to be one of *substantive* due process. *Id.* at 1043. And, before *Pataula,* this court has directly expressed doubts about the idea that a bidder without a contract may have more powerful rights than a bidder with a contract. *See Medical Laundry Servs. v. University of Alabama,* 906

F.2d 571, 573 (11th Cir.1990). Taken together, these cases seem to be a questionable basis for furnishing a constitutional claim to all of the parties who meet disappointment in their pursuit of government contracts despite their compliance with the government's procedure for awarding contracts. At least this would seem to be the case, absent some clearer showing of what process might be due in cases like the one before us. We are not persuaded that a party can easily raise a constitutional claim by making the simple allegation that, in the breakdown of a government contract negotiation, rights were revoked "without proper notice and hearing" or "arbitrarily and capriciously."

In any event, despite these related questions, we, of course, will follow *Pataula* where it applies; but to follow a precedent and to extend it are different things. Therefore, we hold that Circa did not have a protectable property interest arising from the City's acceptance of its redevelopment proposal. Without a constitutionally protected interest, Circa's claim under § 1983 was invalid, and the district court erred in not granting the City's motion for judgment as a matter of law on that claim.

### *Odessa's Contract Claim*

The City argues that the district court made two legal errors that undermine the jury's verdict on Odessa's claim for breach of contract. First, it contends that it was entitled to a directed verdict or judgment as a matter of law because there was not substantial evidence to support Odessa's contract claim. The City postulates that there were a limited number of legal grounds on which to find that it breached its lease with Odessa; and it argues that the trial record does not include enough evidence to justify a verdict for Odessa on any of them.

We undertake a *de novo* review of a district court's rulings on motions for directed verdict or judgment as a matter of law. *Hessen ex rel. Allstate Ins. Co. v. Jaguar Cars, Inc.,* 915 F.2d 641, 644 (11th Cir.1990). Thus, we consider all of the evidence in the light most favorable to the non-moving party. *Id.* Denial of the motion is proper as long as reasonable minds could differ about material

facts. *Id.; see also U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 993 (11th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2710, 129 L.Ed.2d 837 (1994).

When we apply this standard of review, we conclude that there was substantial evidence to support the jury's verdict. The district court correctly instructed the jury that both Odessa and the City were bound by an implied duty to cooperate with each other in good faith in their lease agreement. *See Fernandez v. Vazquez,* 397 So.2d 1171, 1174 (Fla.Dist.Ct.App.1981) ("One established contract principle is that a party's good faith cooperation is an implied condition precedent to performance of a contract."). There was a significant amount of evidence in the trial record that could have supported a finding that the City acted in bad faith in fulfilling some of its promises to facilitate financing. This evidence showed that the City promised to provide part of the financing for the project. It also showed that the City promised to help Odessa obtain a loan from Puller Mortgage by sending Puller a letter confirming the nature of the City's own role as financier. And it showed that the City delayed sending its promised letter to Puller. A reasonable jury could have certainly found that this evidence demonstrated the City's bad faith; and such a jury could also have found that this instance of bad faith was enough to cause the collapse of the lease agreement. As the City points out, one witness did testify that Puller's withdrawal from the project did not ultimately depend upon the City's failure to give assurances of its own financial commitment. But this testimony would not prevent a reasonable jury from finding that the City's bad faith caused Odessa's damages. Odessa's attempts to find financing involved such a delicate balance of arrangements that a jury could reasonably attribute the project's demise and Odessa's losses to any significant disturbance of those arrangements. *Cf. Miller v. Allstate Ins. Co.,* 573 So.2d 24, 28 (Fla.Dist.Ct.App.1990) (discussing the jury's power to find causal links between breaches of contract and subsequent damages).

In its second argument for overturning the verdict in favor of Odessa, the City points to the jury instructions on the Circa group's § 1983 claim. In those instructions, the district court told the jury that Circa could prove its claim by proving (1) that it had a protectable property interest, (2) that the City deprived Circa of this interest, (3) that Circa did not receive proper notice or an opportunity to be heard, (4) that Circa suffered damages. The instructions went on to define "protectable property interest" and "notice." The City thinks that these instructions effectively submitted a question of law to the jury, and it contends that this erroneous submission destroyed the fairness of the trial with regard to every issue.

When a party challenges a jury's verdict by arguing that the jury received erroneous instructions, we examine the charge as a whole, and we will overturn a verdict only if we determine that the overall effect of the entire charge is erroneous and prejudicial. *Vallone v. Lee,* 7 F.3d 196, 198 (11th Cir.1993). An erroneous charge can undermine a verdict if it leads the jury to misunderstand the applicable principles of law. *See id.*

The district court clearly erred here when it told the jury that Circa had to prove that it had a protectable property interest as a part of its claim under § 1983. As our discussion above suggests, the question of the nature of Circa's interest was purely a question of law and, as such, was not within the province of the jury. The § 1983 claim did require the jury to decide a mixed question of law and fact; but the district court's instructions on the claim could have mislead the jury into thinking that it had to define the nature of Circa's interest by making an analysis of the evidence. This potential effect is enough to make the instruction erroneous. *See Schneider v. City of Atlanta,* 628 F.2d 915, 919–20 (5th Cir.1980), *overruled on other grounds, Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984) (en banc).

This error is not, however, enough to infect the other instructions and to prejudice the jury as to the other claims. These other claims, specifically Odessa's contract claim, involve completely distinct questions of law and different factual circumstances.

This distinction is crucial in determining the prejudicial effect of erroneous jury instructions. In *Mosher v. Speedstar Div. of AMCA Internat'l, Inc.*, 979 F.2d 823 (11th Cir.1992), the plaintiff had been injured while using a water drilling rig, and he sued the manufacturer of the rig under theories of strict products liability and negligent design. The district court there misstated the applicable state law in its instructions on the negligence theory, and we held that this error was enough to require a new trial for both claims. *Id.* at 824–27. Because the legal principles and factual circumstances in the two claims were so closely intertwined, the jury in *Mosher* could have been confused or misled in its consideration of one claim by an erroneous instruction with respect to the other. *See id.* Here, unlike the situation in *Mosher*, the erroneous instruction does not pertain in any way to the issues relevant to the challenged verdict on the contract claim. Therefore we cannot conclude that the error prejudiced the entire trial.

For the foregoing reasons, we reverse the district court's judgment for Circa on Circa's § 1983 claim; and we affirm the judgment for Odessa on its contract claim.

AFFIRMED in part and REVERSED in part.