THE AMERICAN RECYCLING COMPANY, INC., a Nevada corp.; and Arc Manatee, Ltd., a Florida limited partnership, Plaintiffs,

v.

COUNTY OF MANATEE, a political subdivision of the State of Florida, Defendant.

No. 96–885–CIV–T–24(B).

United States District Court, M.D. Florida, Tampa Division.

May 6, 1997.

Sidney A. Stubbs, Jr., Jones, Foster, Johnston & Stubbs, P.A., West Palm Beach, FL, for plaintiffs.

Robert W. Pass, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, FL, Hughes Hamilton Rice, Manatee County Attorney's Office, Bradenton, FL, Alan C. Sundberg, Florida State University, Tallahassee, FL, for defendant.

### ORDER

BUCKLEW, District Judge.

This cause is before the Courton Defendant's Motion for Summary Judgment (Doc. No. 16 filed September 10, 1996). Defendant filed a memorandum in support as well as several exhibits. Plaintiffs[1] filed a response in opposition with supporting exhibits on Oc-

tober 28, 1996 (Doc. No. 23) The Court conducted a hearing on the matter on April 30, 1997.

This action arises out the Defendant's "Request for Proposals," the Plaintiffs' response and the resulting relationship. Plaintiffs commenced this action in state court and Defendant removed it to this Court on May 3, 1996 pursuant to 28 U.S.C. § 1441(a) and (b). This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1443. The complaint alleges breach of contract (Count I), section 1983 violations (Count II) and estoppel (Count III).

### Facts

In 1990 the Florida Legislature directed each county to design a program to reduce the solid waste found in their landfills by 30% by the end of 1994. FLA. STAT. § 403.706(4)(a). However, the Legislature provided the counties with no guidance as to how this program should be implemented. On July 29, 1991, the Defendant began its efforts to comply with the statute by issuing a Request for Proposals ("RFP"). According to the RFP, its purpose is to "solic[it] written proposals, open and unlimited in content, from qualified proposers to enter into contract (sic) for a County wide recycling/waste reduction program...." Doc. No. 16, Appendix A, Tab 1, p. GC–I, ¶ I.A. All proposals were to be submitted under seal by 3:00 p.m. September 3, 1991.

While the RFP called for "open and unlimited" proposals, there were minimum content requirements. An individual proposal had to address issues of insurance, the scope of the work, past work experience, period of contract, hours of operation, terms of payment, etc. *Id.* at GC1—GC–3. Additionally, the RFP provided that all proposals constituted irrevocable offers for a period of 90 days. The RFP also reserved certain rights for the County. Specifically, paragraph A.09 stated:

There is no obligation on the part of the County to award the contract to the lowest proposer and the County reserves the right to award the contract to a responsi-

---

1. While there are two Plaintiffs currently before this Court, most of the underlying actions were undertaken by Amerecycle, i.e. The American

Recycling Company, Inc. For purposes of this motion, the Court uses the terms Plaintiffs and Amerecycle interchangeably.

ble proposer submitting a responsive proposal with a resulting negotiated agreement which is most advantageous and in the best interest of the County. The County shall be the sole judge of the proposal and the resulting negotiated agreement that is in its best interest and its decision shall be final.

*Id.* at TC–2.

The requirements of the RFP must be read in conjunction with the County's existing Procurement Code. The purpose of the Procurement Code "is to provide for the fair and equitable treatment of all persons involved in public purchasing by the County, to maximize the purchasing value of public funds in procurement, and to provide safeguards for maintaining a procurement system of quality and integrity." *Id.*, Tab 2, p. 1, § 1–101. Article 3 of the Code details the source selection and the contract formation process. While the Code normally anticipates use of a competitive sealed bidding process, section 3–102(1) provides an alternative approach. When the County determines that the sealed bidding process is not practicable or advantageous, "a contract may be entered into by use of the competitive sealed proposal method." *Id.* at 11. The remaining provisions of section 3–102 discuss the contract formation process under the competitive sealed proposal method. These provisions, 3–102(2) through 3–102(7), require the County to issue the RFP, to give public notice of the RFP, to receive the proposals, to evaluate the proposals, to enter into discussions with proposers and to make an award. Specifically, section 3–102(7) states, "Award shall be made to the responsible offeror whose proposal is determined in writing to be the most advantageous to the County, taking into considerations price and the evaluation factors set forth in the request for proposals." *Id.* at 12.

Plaintiffs timely submitted their proposal on September 3, 1991. Plaintiffs proposed entering into a twenty year contract in which they would build a $48 million facility to process the County's waste using a "composting" process. The proposal required a "put or pay" tipping fee of $49 per ton of acceptable waste. The County had to deliver 525 tons per day or pay as if it had. *Id.*, Appendix B, Tab 1, p. 5 of 7.

On October 13, 1992, the Board of County Commissioners (BOCC) conducted their first public meeting addressing the proposals for a waste management facility. At this hearing, the BOCC accepted the Selection Committee's rankings and authorized negotiations to proceed. Specifically, Commissioner Glass moved "that we authorize the firms as ranked by Staff and uh, uh, allow the negotiation process to proceed." Id., Appendix F, Tab 1, pp. 26–27. Commissioner Hooper seconded the motion and the motion carried four to one. Plaintiffs were ranked number one.

On January 19, 1993, the BOCC addressed a protest by Bedminster, the second ranked proposer. Bedminster complained that the BOCC committed to go ahead with the negotiations without a proper financial review. *Id.*, Tab 2, pp. 32–34. Bedminster filed the protest pursuant to section 9–101 of the Procurement Code. Section 9–101 provides "any actual or prospective bidder, offeror, or contractor who is aggrieved in connection with the solicitation or award of a contract may protest to the Board of County Commissioners of Manatee County." *Id.*, Appendix A, Tab 2, p. 40.

At the protest hearing, the BOCC considered several options. The BOCC considered finding merit to the protest, deferring ruling on the protest pending a work shop on matters relating to all the proposals, or denying the protest for lack of merit. Commissioner Glass moved that the BOCC find the protest without merit. *Id.*, Appendix F, Tab 2, p. 51, lines 13–14. Chairman Harris seconded the motion and it carried four to two. The BOCC found that it had not acted arbitrarily and capriciously in ranking the Plaintiffs number one.. The BOCC then moved and agreed to hold a subsequent work session to "come up with a common strategy for negotiations to proceed, if they are going to proceed." *Id.* at 54, lines 16–18.

On March 16, 1993, the BOCC held another public meeting addressing the waste management facility. The Chairman stated, "What we have before us today, we either vote it up or we vote it down to begin the negotiation process. And, the first part of

that would be the financial viability of Amerecycle and those issues will come back to us if we find that there is difficulty." *Id.*, Tab 3, p. 19.

Commissioner Stephens then responded:

I just want it to be very clear and very exact on the record that that's the very first step and it is a process and that we're not sitting here today approving a 10 year plan at $8 million a year or 20% of the stream or anything else. That it is a process and that the first step is to make sure that they've got the financial abilities to do the job and then from there we will move into additional negotiations.

*Id.* Chairman Harris then stated, "And that's absolutely correct." Finally, Mr. DiFonzo from the County's Public Works Department commented, "Commissioner Stephens loud and clear." *Id.*

After a subsequent discussion on the Plaintiffs' financial position and overall abilities to undertake the project, Chairman Harris stated, "What we are looking at it is authorization for Staff to move forward into the negotiation process so we can get these answers to the questions that have come forward today." *Id.* at 27. Commissioner Glass then made the following motion: "I'm prepared to move forward with the number one selection and I think we've all given reasons why you can do that with some level of comfort and, and bring it back so we'll get the information. Many things could change in the process. I move that we move forward with this process." *Id.*

Commissioner Glass subsequently amended her motion. "[L]et us, let us amend the motion to say that we want the financial responsibility, or the financial analysis conducted and report back, brought back to the Board." Id. at 28–29. The motion carried six to one. *Id.*

On July 7, 1993, Mr. Cuthbert, the County's Purchasing Agent, wrote a letter to Stephen Goldberg, the CEO of Amerecycle. In the introductory paragraph of the letter, Mr. Cuthbert stated that the County had been "reviewing the basis upon which the County would be prepared to move ahead with the implementation and financing of a municipal solid waste recycling/composting facility to be owned and operated by Amerecycle." *Id.*, Appendix A, Tab 4, p. 1. The letter then detailed those issues which needed to be addressed before a contract could be written. "The specific criteria which the County believes must be addressed as a part of the contract between the Company and the County are set forth in the following pages." *Id.* Amerecycle responded to Mr. Cuthbert's letter via a letter from Mr. Goldberg on July 26, 1993. Mr. Goldberg began the letter by stating, "Amerecycle appreciates the opportunity to continue the contract negotiations and RFP process after several months of unanticipated delay." *Id.*, Tab 5, p. 1. He then went on to specifically "acknowledge and agree[ ] that the subject matters described in" the July 7, 1993 letter "represent reasonable and responsive items which must be included, in some form, in a Solid Waste Service Agreement to be negotiated and executed by and between Amerecycle and Manatee County." *Id.* at 1–2. Mr. Goldberg concluded the letter by stating "[w]e look forward to continuing the negotiation and RFP process...." *Id.* at 4.

On October 6, 1993, Mr Goldberg wrote another letter to Mr. Cuthbert addressing the concerns of the July 7, 1993 letter. Once again, Mr. Goldberg concluded the letter by stating "[w]e look forward to continuing the negotiations and RFP process." *Id.*, Appendix C, Tab 1, p. 2.

On October 19, 1993, the BOCC held another public meeting in which the waste management facility was addressed. The BOCC was concerned with the legality of the Plaintiffs' proposed "put or pay" provision. Chairman Harris directed the County Attorney to research the issue and brief the BOCC at the October 28, 1993 meeting. *Id.*, Appendix F, Tab 4, pp. 24–25. At the October 28, 1993, the County Attorney reported that nothing legally prohibited the County from considering such a provision. Chairman Harris then moved "that the Board of County Commissioners direct staff to move into negotiations with Amerecycle and that you bring a definitive proposal back to this board that we can either vote up or vote down." *Id.*, Tab 5, p. 4. After subsequent

discussions, the motion passed seven to zero. Chairman Harris then advised the audience of what had just happened. "For those of you who are in the audience, this is not the end of the issue between MC and Amerecycle. What we have authorized our staff to do is move forward in the negotiation process and to bring back some concrete information and bargaining issues for this board to consider." *Id.* at 11.

Between October 28, 1993 and March 14, 1995, the BOCC took no official action at a public meeting concerning the Plaintiffs' proposal. On March 14, 1995, the BOCC voted to terminate the negotiation process with Plaintiffs and to reject all other proposals. *Id.*, Tab 6, pp. 1, 9.

Without citing to any specific provision of the Procurement Code, the Plaintiffs submitted a letter, dated March 20, 1995, protesting the BOCC's decision to terminate negotiations with the Plaintiffs and to reject all other proposals. *Id.*, Appendix A, Tab 6. Via a letter dated March 20.1995, the County rejected the Plaintiffs' protest. Subsequently, via a letter dated April 3, 1995, the Plaintiffs sought reconsideration of the denial and requested a hearing. *Id.*, Tab 7. At the May 9, 1995 reconsideration hearing, Mr. Adam Weaver spoke on behalf of the Plaintiffs.

As you know, Manatee County issued its request for proposals, its RFP in July of 1991 in order to meet the Florida statutory mandates for solid waste. You submitted that request for performance and Amerecycle responded. In reviewing the correspondence, some of the comments, some of the minutes of some of the public meetings during this process, it appears that there may be some exculpatory language, which is a word lawyers use, contained in the original RFP that there was no obligation on behalf of the County Commission to enter into a binding contract based upon the receipt of responses to the RFP, that somehow that absolves you from any re-

sponsibility to the things that have happened to Amerecycle. I submit to you, if I go through some of the facts and history of this that, that in fact that's not the case and that a lot has happened since that time which has changed the posture of this matter, both factually and legally. After we submitted the RFP in response to your request, and that's important to remember, that Amerecycle did not come in here seeking to sell you a bill of goods. You asked for proposals to solve a specific problem and they provided you a response to solve the problem that you identified. In October, 1992, your consultant, your respected consultant, R.W. Beck, recommended, and this Board declared, that we were a responsive bidder[2] to the RFP. Indeed there was protest from the next bidder to the RFP which you deny (sic) ... After a series of public meetings, this Board in March of 1993 reaffirmed the number one status as being responsive for Amerecycle. You then authorized R.W. Beck and Kidder–Peabody to evaluate both the technical and financial aspects of this proposal. Then, and what I think is really the critical defining and turning point moment in the history of this matter, in July of 1993, the Board of County Commissioners, sitting as a board, authorized a letter, ..., to Stephen Goldberg regarding what the status of this matter was and where Manatee County viewed this. And again, this was Board, Board ratified action. Effectively, you stated Manatee County and its technical and financial advisors have been reviewing the basis upon which the County would be prepared to move ahead with the implementation and financing of a municipal solid waste recycling composting facility to be owned and operated by Amerecycle ... You went on to say in that same letter that upon receipt of that, you were ready to develop a term sheet for contract development. Amerecycle responded ... You then, on October 28,

---

**2.** Section 1–201(49) of the Procurement Code defines "responsive bidder" as "a person who has submitted a bid which conforms in all material respects to the requirements set forth in the invitation for bids." Doc. No. 16, Appendix A, Tab 2, p. 6. Technically, the use of this term is incorrect. Pursuant to section 3–102(1) of the

Procurement Code, the County decided not to use the competitive sealed bidding process. Rather, the County used the competitive sealed proposals process. Accordingly, there is no way the County at the October 13, 1992 meeting could have deemed the Plaintiffs to be a responsive bidder.

1993, directed your staff to do the necessary things to bring back a contract to vote up or down ... This company, after responding to your letter of July, 1993 changed its posture permanently, and its legal status. From that time forward, Amerecycle has had, continues to have an enforceable proprietary contract right for which it is entitled to due process of law and for which there is a remedy under the Federal Constitution and under § 1983 of the United States Code for deprivation of that due process right.... 

*Id.*, Appendix F, Tab 7, pp. 2–3. The BOCC, in a five to two vote, reaffirmed its decision rejecting the Plaintiffs' protest. *Id.* at 1, 8.

## Motion for Summary Judgment Standard

The Eleventh Circuit has discussed the standard for granting summary judgment:

Federal Rule of Civil Procedure 56(c) authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.C.P. 56(c).

*Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (1993), *reh'g and reh'g en banc denied*, 16 F.3d 1233 (11th Cir.1994),

The Eleventh Circuit recognized the seminal case concerning summary judgment, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), by highlighting the following passage:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case

necessarily renders all other facts immaterial.

*Hairston*, 9 F.3d at 918.

Finally, the parties' respective burdens and the Court's responsibilities were outlined: The party seeking summary judgment bears the initial burden to demonstrate to the district court the basis for its motion for summary judgment and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact. *Taylor v. Espy*, 816 F.Supp. 1553, 1556 (N.D.Ga.1993) (citation omitted). In assessing whether the movant has met this burden, the district court must review the evidence and all factual inferences drawn therefrom, in the light most favorable to the non-moving party. *Welch v. Celotex*, 951 F.2d 1235, 1237 (11th Cir.1992); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987). If the movant successfully discharges its burden, the burden then shifts to the non-movant to establish, by going beyond the pleadings, that there exist genuine issues of material fact. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.[,]* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

Applicable substantive law will identify those facts that are material. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.* For factual issues to be considered genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56. It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be tried. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. The Court must avoid weighing conflicting evidence or making credibility determinations. *Id.* at 255, 106 S.Ct. at 2513–14. Instead, "[t]he evidence of the non-movant is to be believed in his favor." *Id.* Where

a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933–934 (11th Cir. 1989) (citation omitted).

*Id.* at 918–19. *See Mulhall v. Advance Sec. Inc.*, 19 F.3d 586, 589–90 (11th Cir.1994); *Howard v. BP Oil Co.*, 32 F.3d 520, 523–24 (11th Cir.1994).

### Discussion

After an initial review of the papers submitted by the parties in favor of and in opposition to the motion, the Court set this matter for a hearing. In the notice of hearing, the Court highlighted the parties' arguments as it then understood them and identified those issues upon which it wanted argument. Specifically, the Court stated that the language of the October 13, 1992 hearing did not constitute an acceptance of the Plaintiffs' offer and did not mandate the results reached in *Dedmond v. Escambia County*, 244 So.2d 758 (Fla. 1st DCA 1971); *Schloesser v. Dill*, 383 So.2d 1129 (Fla. 3d DCA 1980), and *H. Gore Enterprises, Inc. v. City of West Palm Beach*, 617 So.2d 1160 (Fla. 4th DCA 1993). The Court then directed the parties to discuss the effect of the January 19, 1993 protest hearing and identify any activity subsequent to the October 13, 1992 hearing which might indicate that the County had made an official determination as to whose proposal was the most advantageous to the County. The hearing was conducted on April 30, 1997.

*Count I—Breach of Contract*

Coupling the requirements of the Statute of Frauds, FLA. STAT. § 725.01, with the requirements of the Sunshine law, FLA. STAT. § 286.011, Defendant argues summary judgment should be entered in its favor as to Count I because no contract was ever entered into by the parties. Specifically, Defendant notes that Plaintiffs' proposal suggested that the Plaintiffs and the County enter into a twenty year contract. Thus, pursuant to the Statute of Frauds, the contract had to be in writing. No such writing or official contract, however, is attached to the complaint. Rather, paragraph 16.B of the complaint alleges that the BOCC "awarded a contract to Amerecycle in accordance with the RFP and Section 3–102(7) of the Procurement Code." Doc. No. 2. Moreover, Defendant notes, since it is a municipal government, it cannot undertake any binding actions absent a public meeting. FLA. STAT. § 286.011. Accordingly, Defendant concludes that unless Plaintiffs can present some legally acceptable writing complying with the Statute of Frauds and the Sunshine law, no contract exists. The only legally acceptable writings, Defendant contends, are: (1) the RFP and Procurement Code; (2) any writings signed by the BOCC or expressly authorized by the BOCC; and (3) the transcribed writings of the BOCC.

Plaintiffs' response suggests a return to basic contract principles. The initial issue is not whether there is a sufficient writing, but whether the facts show proper contract formation, *i.e.* did the Plaintiffs make an offer? Did the Defendant accept this offer? Are there definite terms? Once these questions are answered, Plaintiffs argue, the Court can then address whether there is a writing sufficient to satisfy the Statute of Frauds and the Sunshine law.

The Court agrees with Plaintiffs' approach. The threshold issue is whether the Defendant accepted the Plaintiffs' offer. Although Defendant's memorandum has not presented its argument in such terms, it has, in essence, suggested such an argument. Specifically, Defendant argues that "Plaintiffs' claims amount to nothing more than an unenforceable agreement to agree," and therefore, there is no writing which can satisfy the Statute of Frauds. Doc. No. 16, p. 17. Accordingly, it is imperative for the Court to determine whether there was an agreement. Once this determination is made, the Court can then address whether there are writings sufficient to satisfy the Statute of Frauds and the Sunshine law.

Plaintiffs maintain that they made an offer via their proposal and that the Defendant accepted this offer either via its actions at the October 13, 1992 hearing, via the language of the Procurement Code and the RFP, and/or via its action at the January 19,

1993 hearing. In sum, Plaintiffs argue that since their proposal contained definite terms and since the BOCC approved it at a public meeting, a contract was formed under the principles articulated in *Dedmond, Schloesser,* and *H. Gore Enterprises, Inc.* and that the Statute of Frauds is satisfied via the RFP, the procurement code, Plaintiffs' proposal and/or the public actions of the BOCC.

Plaintiffs' argument stresses the language of the Code and the RFP. The Court agrees with Plaintiffs that Article 3 of the Code identifies the source selection process and the contract formation process. Specifically, sections 3–102(2) through 3–102(6) require the County to make a request for proposals, to provide public notice of this request, to receive the sealed proposals, to evaluate the proposals pursuant to the factors articulated in the RFP and finally to conduct discussions with the responsible proposers. Section 3–102(6) states:

> As provided in the request for proposals, discussions may be conducted with responsible offerors who submit proposals determined to be reasonably susceptible of being selected for award for the purpose of clarification to assure full understanding of, and conformance to, the solicitation requirements. Offerors shall be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals and such revisions may be permitted after submissions and prior to award for the purpose of obtaining best and final offers.

Once these provisions are complied with, section 3–102(7) provides that "[a]ward shall be made to the responsible offeror whose proposal is determined in writing to be the most advantageous to the County, taking into consideration price and the evaluation factors or criteria set forth in the request for proposals. No other factors or criteria shall be used in the evaluation. The contract file shall contain the basis on which the award is made."

When the Court issued the notice of hearing, it construed Defendant's argument to be that no award was made. In other words, no contract had been formed under the Code because no award or acceptance of Plaintiffs' offer had been made pursuant to 3–102(7).

Rather, the County and the Plaintiffs were merely negotiating as provided for under section 3–102(6). At the hearing, Defendant argued that while an award had been made under 3–102(7) at some point in time, the award was merely an award of the right of exclusive negotiations with the Defendant It was not an acceptance of Plaintiffs' offer. Because of this misunderstanding,the Court put too much emphasis on the actions of the BOCC at the October 13, 1992 hearing and the protest hearing in the notice of hearing.

■ Florida law recognizes that "[i]f the parties so intend, a contract is binding from the time it is made even though the parties also agree that a formal writing embodying its provisions will subsequently be prepared." *Eastern Air Lines, Inc. v. Mobil Oil* Corp., 564 F.Supp. 1131, 1145 (S.D.Fla.1983), *aff'd,* 735 F.2d 1379 (Em.App.1989); *Bluevack, Inc. v. Walter E. Heller & Co. of Fla.,* 331 So.2d 359, 360 (Fla. 3d DCA 1976). This principle applies equally to municipalities. In *Dedmond v. Escambia County,* 244 So.2d 758 (Fla. 1st DCA 1971), the appellant, Mr. Dedmond, submitted his bid in response to the county's request. The county had requested bids for a lease to operate concessions at county owned Rosemond Johnson Beach. The county board then voted four to one *to award the lease* to Mr. Dedmond. Three days later, the clerk of the circuit court and *ex officio county auditor wrote* Mr. Dedmond a letter advising him "that the Board of County Commissioners accepted [his] bid on Rosemond Johnson Beach Concession as being the most favorable to the County *and voted to award* [him] the lease for a period of five (5) years, beginning May 1, 1970." *Id.* at 759–60 (emphasis added). The letter then required Mr. Dedmond to contact the county attorney "to execute the lease agreement with the county" within a certain time period. *Id.* at 760. Subsequent to this letter, but before the deadline for meeting with the county attorney, the county changed its mind and rescinded its decision. Mr. Dedmond then sued to enjoin the county from readvertising for bids.

The trial court granted the county's motion to dismiss, holding that there was no binding contract between the parties until a written

lease agreement was executed. *Id.* On appeal, the court reversed the trial court's decision. The court held that to approve the cancellation would violate the mandate of Florida Statute 125.35,[3] "requiring that the award be made to the highest and best bidder complying with the terms and conditions of the call for bids." *Id.* at 761. The court concluded that the county "had no authority to cancel the award of the lease to appellant in the circumstances shown in this record." *Id.*

Approximately ten years after *Dedmond,* the Third District Court of Appeal addressed the issue of contract formation via the competitive bidding process in *Schloesser v. Dill,* 383 So.2d 1129 (Fla. 3d DCA 1980). In *Schloesser,* the Monroe County Board of County Commissioners solicited bids "by any parties interested in the lease, renovation and operation of the airport cocktail lounge," *Id.* at 1130. Of the six bids received, the county chose Mr. Dill's. Mr Dill "was duly notified of the Board's decision in his favor, and instructed to work out a written lease agreement with the County Attorney." *Id.* The county, however, subsequently rejected the negotiated lease agreement and intended to reopen the bidding process. Mr. Dill then sued for specific performance which the trial court awarded, citing to *Dedmond.*

On appeal, the county argued that the solicitation of bids was merely an invitation for offers. The solicitation stated, "Each proposal shall constitute an offer to the County as outlined therein and shall be irrevocable after the time announced for the opening thereof." *Id.* In affirming the trial court's decision, the appellate court stressed that the county had informed Mr. Dill via letter that the board had "accepted" his bid and that he was to contact the county attorney to execute an agreement *Id.* Once the county had informed Mr. Dill of its acceptance of his bid, the court concluded, a valid and enforceable contract had arisen. Thus, the trial was correct in awarding Mr. Dill specific performance. *Id.* at 1131.

More recently, the Fourth District Court of Appeal addressed the issue in *H. Gore Enterprises, Inc. v. City of West Palm Beach,* 617 So.2d 1160 (Fla. 4th DCA 1993). In *Gore,* the city requested bids for towing and storage services. After the city commission reviewed the sealed bids, the mayor awarded the bid to Gore Enterprises. *Id.* at 1160. A timely protest was then filed by a competitive bidder, a hearing was held, the award rescinded, all other bids rejected and the city issued a new request for bids. *Id.* Gore Enterprises then sued the city seeking specific performance and injunctive relief. The trial court entered judgment in favor of the city and Gore Enterprises appealed. *Id.* In affirming the trial court's decision, the court emphasized the language of the city's procurement code. The code distinguished between an "award of bid" and "award of contract."

> Of primary significance to this case is the city's procurement code which provides for both an "award of bid" and an "award of contract." While neither term is defined, the code impliedly recognizes that the terms are not synonymous. For example, after the bids have been opened, and a *bid award* announced, an unsuccessful bidder may file a protest, the timely filing of which requires the *award of the contract* to be delayed pending resolution of such protest.

*Id.* at 1161 (emphasis in the original). Since Gore Enterprises had merely be awarded a bid, no contract had been formed. *Id.* at 1161.

Defendant argues that the instant situation is similar to that in *Gore.* Defendant interprets the Code and the RFP to mean that an "award" is merely an award of the exclusive right to attempt to negotiate a contract. Therefore, although Plaintiffs were "awarded" pursuant to 3–102(7), they were not awarded a contract. Defendant argues that this conclusion is supported by paragraph A.09 and A.13 of the RFP. Paragraph A.09 provides:

---

**3.** Section 125.35 governs the sale or lease of real and personal property by the county. The section provides that a board of county commissioners is authorized to sell property belonging to the county to the highest and best bidder. None of the parties have argued its application to the instant case.

*The County reserves the right to accept or reject* any and/or all proposals, to waive irregularities and technicalities, and to request resubmission ... There is no obligation on the part of the County to award the contract to the lowest proposer and the County reserves the right to award the contract to a responsible proposer submitting a responsive proposal with a resulting negotiated agreement which is most advantageous and in the best interest of the County. The County shall be the sole judge of the proposal and the resulting negotiated agreement that is in its best interest and its decision shall be final. (emphasis in the original)

Paragraph A. 13 states, "Any agreement or contract resulting from the acceptance of a proposal shall be on *forms either supplied by or approved by* the County and shall contain, at a minimum, applicable provisions of the request for proposal, and the proposers submission to the proposal." (emphasis in the original).

█ While the Court does not agree that section 3–102(7) defines "award" as the exclusive right to attempt to negotiate a contract,[4] the Court does agree that the definition of "award" can only be determined by reference to the RFP. The distinctions between the bid process and the proposal process support this conclusion. Section 3–102(1) suggests that the bid process is the standard purchasing approach. The proposal process is used only when the bid process "is either not practicable or not advantageous to the County." The bid process would not be practicable when, as in the instant case, the County is not exactly sure what it wants. Therefore, under the bid process (because the County is sure what it wants), the County is left with little discretion in determining which bid to accept. Section 3–102(5) provides that the bid:

shall be *unconditionally accepted* without alteration or correction ... Bids shall be evaluated based on the requirements set forth in the invitation for bids ... Those

criteria that will affect the bid price and be considered in evaluation for award shall be *objectively measurable,* such as discounts, transportation costs, and total or life cycle costs .... (emphasis added)

Additionally, once these objective factors are evaluated, the bid is automatically awarded to the lowest responsible bidder via written notice. Section 3–101(7) states that *"[t]he contract* shall be awarded with reasonable promptness by appropriate written notice to the lowest responsible and responsive bidder whose bid meets the requirements and criteria set forth in the invitation for bids." However, under the proposal process (because the County is unsure of what it wants), section 3–102(6) expressly provides for discussions between the County and the proposers. Moreover, once the discussions are ended, nothing in section 3–102(7) requires the automatic award to the proposer with the "numerical" lowest ranking. Finally, and most importantly, while section 3–101(7) specifically states that a "contract" shall be awarded to the lowest bidder, section 3–102(7) merely states that an "award" shall be made. Therefore, although the Code specifically provides for the awarding of a contract under the bid process, no such provision exists under the proposal process. Rather, one *must* look at the language of the RFP to determine if and when a contract is awarded.

█ Paragraphs A.09 and A.16 of the RFP indicate a distinction between being ranked the lowest proposer and being awarded the contract. Paragraph A. 16 provides that the proposals would be ranked by the selection committee and that a lowest proposer would be determined. Paragraph A.09, however, states that the County is under "no obligation ... to award the contract to the lowest proposer." Paragraph A.09 further indicates that the contract would only be awarded to the proposer whose "resulting negotiated agreement ... is in the best interest of the County." Accordingly, although the Plaintiffs were "awarded" the position of

**4.** Nothing in the Code supports such an interpretation. The language of section 3–102(7), on its face, does not define "award," much less define it as an "exclusive" right to attempt to negotiate a contract. Section 3–102(7) merely states that an award "shall be made to the responsible offeror whose proposal is determined in writing to be the most advantageous to the County, taking into consideration price and the evaluation factors set forth in the request for proposals."

the lowest proposer at the October 13, 1992 meeting pursuant to 3–102(7), they were never awarded a contract pursuant to paragraphs A.09 and A.13 of the RFP. No such "resulting negotiated agreement" exits.

■ The distinction in the language of the RFP and the Code between "award" and "award of contract" is significant. Under the principles articulated in *Dedmond* and *Schloesser,* a contract exists upon the award of a bid, even though no formal writing exists. In other words, as a matter of contract formation, by accepting the bid, the city or county accepts the bidder's offer containing definite terms, thereby creating a contract. However, under the holding in *Gore,* no contract exists where the procurement code distinguishes between an award of a bid and an award of a contract because by accepting the bid, the city or county, as a matter of law, is not accepting the bidder's offer. This Court finds that the Defendant never accepted Plaintiffs' offer because while Defendant did award Plaintiffs the number one ranking pursuant to 3–102(7), this award was not an award of a contract pursuant to the RFP.

The facts of this case provide further support for the conclusion that the Plaintiffs were never awarded a contract. As previously discussed, the BOCC repeatedly stated at the public meetings that only negotiations were proceeding. Additionally, in the letter to Bedminster's counsel in response to Bedminster's request for a protest hearing under section 9–101, the County Administrator reiterated that the BOCC had only authorized negotiations to proceed with the top ranked firm.

> This is to acknowledge receipt of your letter of October 19, 1992 on behalf of your client, Bedminster Bioconversion Corporation, regarding their (sic) protest of the action taken by the Board of County Commissioners on October 13, 1992 regarding the above Request For Proposals, *authorizing negotiations with the top ranked firm,* The American Recycling Company, Inc.

Doc. No. 35, Exhibit 2 (emphasis added).

The actions of the Plaintiffs also indicate that they never believed that they had been awarded a contract. Of particular significance is the 10–Q forms submitted by Plaintiffs' parent corporation, Coastland Corporation of Florida, to the Securities Exchange Commission ("SEC"). In Coastland's 10–Q submitted for the first quarter of 1994, Coastland stated, "The Company continues to negotiate a contract with Manatee County, Florida, to design, build and operate a Municipal Solid Waste (MSW) recycling and composting facility ... There can be no assurance the Company can successfully consummate the contract with Manatee County." Doc. No. 33, Page 13 of 17 of First Quarter Report. In Coastland's 10–Q for the second quarter of 1994, Coastland again noted the uncertainty of the negotiations with Manatee County. "The Company is currently negotiating a contract with Manatee County, Florida, to design, build and operate an MSW recycling and composting facility ... There can be no assurance the Company can successfully consummate the contract with Manatee County." *Id.,* Page 16 of 30 of Second Quarter Report. Finally, in the 10–Q for the third quarter of 1994, Coastland stated, "The Company is currently negotiating a contract with Manatee County, Florida, to design, build and operate an MSW recycling and composting facility with an estimated capital cost of $47,000,000 ... There can be no assurance the Company can successfully consummate the contract with Manatee County, Florida." *Id.,* Page 8 of 22, Third Quarter Report.

The Court finds that Defendant never accepted Plaintiffs' offer and that a contract never formed. At best, Defendant awarded Plaintiffs the position of lowest ranked proposer. Accordingly, the Court grants Defendant's motion as to Count I. Count I is dismissed.

*Count II—42 US. C. § 1983 Due Process Claims*

Defendant contends summary judgment should be entered in its favor as to Count II because (1) the County provided the Plaintiffs with sufficient post-deprivation remedies so as to defeat any procedural due process claim and (2) Plaintiffs possessed neither a "fundamental property" interest nor any pro-

tected property right so as to give rise to a substantive due process claim.

Plaintiffs' response again suggests a more simplified approach. The first issue is whether the Plaintiffs had a protected property interest within the meaning of the Fourteenth Amendment. Second, assuming Plaintiffs' have such an interest, the issue is whether Defendant deprived Plaintiffs of that right without providing due process. This latter issue further subdivides into (1) whether the plaintiffs were afforded procedural due process, i.e. notice and hearing, and (2) whether the Plaintiffs were afforded substantive due process, i.e. did the Defendant deprive Plaintiffs of their property rights with improper motives and via arbitrary and capricious means.

■ The Court agrees with Plaintiffs' approach. The threshold issue is whether Plaintiffs had a constitutionally protected property interest within the Fourteenth Amendment. While state law governs as to whether Plaintiffs had a protectable property interest, the mere existence of an enforceable contract with the state does not give rise to a constitutionally protected property interest It is not enough that there is an applicable statute, ordinance or policy. Rather, as both parties agree, the determinative issue is the level of discretion afforded to the governmental body by the statutes, ordinances, policies or rules. The more discretionary authority afforded the governmental body by the statutes, etc., the less likely a constitutional protected property right exists. *See Circa Ltd. v. City of Miami*, 79 F.3d 1057 (11th Cir.1996); *Key West Harbour v. City of Key West*, 987 F.2d 723 (11th Cir.1993); *Pataula Elec. Membership Corp. v. Whitworth*, 951 F.2d 1238 (11th Cir.1992).

Having agreed on these legal issues, the parties then proceed to argue from different perspectives. Defendant contends the RFP and Code provide the County with a vast amount of discretionary authority. Defendant highlights the distinctions between the competitive sealed bidding process and the competitive sealed proposals process. Most importantly, Defendant stresses that there was never a contract between the Plaintiffs and the Defendant. Thus, at all times during this action, the less discretionary provisions of the Code and RFP never applied. In others words, at all relevant times, the parties merely negotiated with each other, giving rise, at most, to a unilateral expectation of a contract. Such expectation, Defendant notes, does not constitute a constitutionally protected property right. *Cunningham v. Adams*, 808 F.2d 815, 820 (11th Cir.1987). Plaintiffs maintain that once they were awarded the contract, the provisions of the RFP and the Code severely limited the Defendant's discretionary authority. The only discretion left to the County involved the actual contract language used to incorporate the terms of Plaintiffs' proposal and right to reject any contract which did not conform with the RFP. Additionally, Plaintiffs argue that their expenditure of millions of dollars in the detrimental reliance on the RFP and the Code raises their unilateral expectation into a constitutionally protected property interest. *Reserve, Ltd. v. Town of Longboat Key*, 17 F.3d 1374 (11th Cir.1994), *cert. denied*, 513 U.S. 1080, 115 S.Ct. 729, 130 L.Ed.2d 633 (1995).

■ The Court finds that summary judgment should be entered in favor of the Defendant as to Count II. The Plaintiffs lack a protected property interest or a "legitimate claim of entitlement" within the meaning of the Fourteenth Amendment. First, to the extent that such claim is premised upon the existence of a contract, it must be dismissed because no such contract exists. Second, the Plaintiffs' unilateral expectation of contract was never transformed into a legitimate claim of entitlement either by the language of the Code and RFP or by the "detrimental reliance" actions of the Plaintiffs.

As previously noted, Plaintiffs were merely awarded the number one ranking pursuant to 3–102(7). They were never awarded a contract pursuant to the RFP. Thus, the discretionary provisions of the RFP remained in place. The Defendant was never under any obligation to award a contract to the Plaintiffs. Accordingly, the Plaintiffs merely had a unilateral expectation of a contract. Such a right does not support the section 1983 claim. *Cunningham v. Adams*, 808 F.2d 815, 820 (11th Cir.1987). Additionally, the

Court is unpersuaded by the Plaintiffs' reliance on *Reserve*. The analogy is strained. The Court finds a significant difference between a party who has been awarded a building permit and a party who has been awarded the number one ranking after a request for proposals.. Once the permit is granted, the governmental body has little discretion in revoking it. However, under the RFP and the Code, the award of the number one ranking in no significant way limited the County's discretionary authority. Under paragraph A.09 of the RFP, the County was under no obligation to award the contract to the "lowest proposer." Furthermore, under the holding in *Reserve*, the Plaintiffs must also show equitable estoppel. This requires the Plaintiffs to show good faith reliance upon the actions of the Defendant. *Reserve*, 17 F.3d at 1380. While there is no doubt Plaintiffs expended a significant amount of money, the Court questions whether such action was done in "good faith." As previously noted, the BOCC repeatedly made it clear that it was only entering into negotiations with the Plaintiffs and that no contract existed. More importantly, the Plaintiffs never believed that a contract existed according to their 10–Q forms.

Accordingly, since the Plaintiffs have no constitutionally protected right, the Court need not determine whether the deprivation of such right violated Plaintiffs' procedural and substantive due process rights. Sum-mary judgment is entered in favor of the Defendant as to Count II.

*Count III—Estoppel*

Defendant contends summary judgment should be entered in their favor as to Count III's claims for lost profits and out of pocket expenses. Having already entered summary judgment in favor of the Defendants as to Count II, this Court not longer has subject matter jurisdiction. The Court declines to exercise its supplemental jurisdiction over this claim. Accordingly, it is dismissed without prejudice for lack of jurisdiction.

*Conclusion*

Accordingly, it is **ADJUDGED AND OR-DERED** that Defendant's Motion for Summary Judgment (Doc. No. 16, filed September 10, 1996) is **GRANTED IN PART**. The Court enters summary judgment in favor of the Defendant as to Counts I and II. The Court declines to exercise supplemental jurisdiction over Count III. The Clerk is directed to enter judgment in favor of the Defendant as to Counts I and II and to **CLOSE** this case.