KING, Justice,
for the Court:
¶ 1. Vicksburg Chemical Company (VCC) filed for bankruptcy in 2002. Included in its bankruptcy estate was over 500 acres of real property, a portion of which was contaminated. Pursuant to an agreed order, the bankruptcy court allowed VCC to abandon the property and allowed the Mississippi Department of Environmental Quality (MDEQ) to choose the purchaser. Without the aid of any guidelines or statutory law regarding this process, MDEQ, at the suggestion of the Attorney General’s Office (AG), published a Request for Proposals (RFP) to identify interested parties capable of removing the contamination. The plaintiff, Pacific Chlorine, Inc. (PCI), was one of several companies to submit a proposal. MDEQ did not select PCI’s proposal, but instead selected Harcros Chemicals, Inc. (Harcros), a company which worked closely with the City of Vicksburg (the City) on its proposal.
¶ 2. Aggrieved, PCI sued MDEQ and the City in the Circuit Court of Hinds County, raising several claims. PCI settled with the City. Following a bench trial, the trial court rendered a judgment against MDEQ. Now, MDEQ appeals to this Court, raising six assignments of error that fall into three categories: whether PCI is required to exhaust its administrative remedies, whether the trial court erred by denying MDEQ’s motion to dismiss/motion for summary judgment, and whether MDEQ is immune from suit under the Mississippi Tort Claims Act (MTCA).
¶ 3. This case presents an issue of first impression in which the Court must review whether MDEQ, the state agency tasked with overseeing the cleanup of contaminated land, is acting within the scope of its authority when assisting a bankruptcy court with finding a purchaser for contaminated land. We find it is. We also rule that the trial court erred by finding that the RFP created a contract between the parties. Because we resolve the case on this issue, the remaining issues are moot, and we reverse and render the trial court’s judgment.
FACTS AND PROCEDURAL HISTORY
¶ 4. In 2002, VCC filed for bankruptcy in the United States Bankruptcy Court for the Southern District of New York. On August 29, 2002, VCC filed a motion with the bankruptcy court seeking to abandon the VCC facility and its surrounding prop *435 erty in exchange for a release of liability for the environmental contamination.[1] The property consisted of over 500 acres, approximately 40 acres of which was contaminated, located south of Vicksburg, Mississippi, along the Mississippi River. PCI monitored the bankruptcy proceeding.[2] Both MDEQ and Harcros filed objections to the motion to abandon the property. MDEQ requested that VCC be enjoined from transferring the property until it complied with applicable environmental standards.
¶ 5. On October 18, 2002, the bankruptcy court entered a “Stipulation and Order Authorizing Abandonment of ... Vicksburg Manufacturing Facility and Granting Related Relief.”[3] In order to be released from its liability arising from the environmental contamination of the subject property, VCC agreed to allow MDEQ to select the purchaser of its property. Pursuant to the parties’ agreement, the bankruptcy court authorized abandonment of the property to the non-bankruptcy estate and allowed MDEQ to select the purchaser of the facility.[4] The order provided that:
[U]pon written request by the MDEQ, the Vicksburg non-bankruptcy estate shall convey title to the Vicksburg facility or part thereof to any entity identified by the MDEQ. Any consideration received for the transfer of the respective Facilities or parts thereof shall be applied to the environmental cleanup of the respective Facilities and shall be treated as a contribution by the Debtors to such cleanup.... [5]
¶ 6. Charles Howard Chisolm, then Executive Director of MDEQ, testified that MDEQ had never been in this position— assisting a bankruptcy court and a private company in finding a buyer for private property — and, thus, sought advice from the AG. In a letter to the AG, Chisolm asked the following:
Do any state laws, such as bidding or property sale laws, apply to MDEQ’s direction under court order of the sale of property that is not state property, or do any state laws provide guidance as to how MDEQ should undertake to choose between various proposals by third parties to purchase the property. It is MDEQ’s current plan to have the proceeds of any sale deposited in a trust account already existing for the remediation of this property. My question pertains to the actual mechanics of choosing *436 a buyer and directing the sale of the property.
Charles H. Chisolm, Op. Att’y Gen., 2002 WL 31911101 (Nov. 8, 2002). Because this was not state property, the AG opined that state law did not apply and directed MDEQ to proceed under the bankruptcy-court order. Id. However, the AG encouraged MDEQ to “consider seeking competitive proposals in order to receive the greatest possible public benefit.” Id.
¶ 7. In January 2003, MDEQ published its RFP for the VCC property, stating its intention to select a purchaser first who would remediate the property and second return it to productive use.[6] The RFP clearly stated that:
This is not a formal bidding process, and MDEQ reserves the right to reject all proposals or to request additional information from some, all, or none of the prospective purchasers. MDEQ reserves the right to reopen the proposal process and to accept further proposals from other parties. No warranty is made or intended as to the information concerning VCC or VCC’s property stated in this request for proposals. Those who submit proposals are at risk to conduct appropriate investigation concerning the correctness or representations made by VCC or other parties and/or contained or reflected in this request or in the files of MDEQ.
(Emphasis added). MDEQ requested prospective purchasers to provide their name, a business plan (including plans for remediation and property development), and their history of environmental compliance for all operations in the United States. The selected company, if any, would be given simply the right to continue negotiations to purchase the property.
¶8. First, MDEQ chose to negotiate ■with Jacobs Entertainment but the company later pulled out of negotiations. Then the City, which wished to build a golf course, offered to purchase the uncontaminated property, but MDEQ declined its offer.
¶ 9. Thereafter, on July 21, 2003, Chi-solm sent a letter to two primary contenders — PCI[7] and Harcros.[8] Chisolm instructed the companies, if they remained interested, to “deliver a detailed offer to purchase the facility and property, provide environmental insurance, reach a guaranteed fixed price remediation contract, sell property to the City, etc., or any combination of the above that you choose to create your offer package.” The companies were to provide any additional information it wanted MDEQ to consider by August 22, 2003, to Trey Hess, MDEQ’s point person for the RFP. MDEQ also encouraged the companies to meet with the City, which had a keen interest in the land’s use, prior to submitting its proposals. Once again, MDEQ stated that it “[did] not intend to enter a period of ‘exclusive negotiations’ or an option contract with any party,” and it “[was] not obligated to accept any proposal made to it by [the companies].” MDEQ also had assembled its own team of professionals to review the proposals and help it make the final decision.
*437 ¶ 10. Both PCI and Harcros shared their proposals with City officials. PCI’s proposal was a more in-depth, multi-vol-ume document, and Harcros’s proposal was a summary of the services it planned to provide.[9] Both companies planned to reopen the plant. And both companies planned to remediate the property — PCI committed $2.5 million and Harcros pledged $8 million to the cleanup. According to Nancy Thomas, the City attorney, PCI initially proposed (1) to sale the City certain parcels of land for $1.25 million contingent upon the City selling PCI gas at cost plus twenty-five cents per unit, (2) a 10 percent profit-sharing deal, and (3) a guarantee that the City would purchase all of its chlorine from PCI. Thomas informed PCI that it was illegal for the City to share profits with a for-profit company, to bind a future administration to a gas contract, and to give its chlorine contract to PCI instead of the lowest and best bidder. In hopes of pleasing the City, PCI slightly revised its proposal, eliminating the profit-sharing and chlorine-contract provisions, but the offer still included the gas-supply provision.
¶ 11. For its proposal, Harcros partnered with Arcadis G & M, Incorporated, a well-known remediation company, to create a plan to cleanup, reuse, and redevelop the property. It also proposed to work with the City to develop a championship-style golf course. According to Thomas, this option would not require the City to expend funds.
¶ 12. The City preferred Harcros’s proposal and made its preference known to MDEQ and PCI well before the RFP deadline. On June 6, 2003, the City wrote MDEQ, stating that it was working with Harcros on a conceptual proposal for the VCC property. Chisolm testified that MDEQ was not bound by the City’s desires. While MDEQ appreciated the City’s proactive approach, Chisolm made clear to the City that MDEQ would continue to consider independently all options. On August 11, 2003, the City took it upon itself to inform PCI that Harcros’s proposal was more suitable for its needs. Despite this, PCI scheduled a meeting with the City to discuss other options, but that meeting was unsuccessful.[10]
¶ 13. Harcros requested that the City enter into an exclusive-option period before it expended resources to conduct a feasibility study. Thus, Thomas emailed Hess, asking whether the City could agree. MDEQ notified the City that it could not sign the agreement. Thomas testified that the City was concerned, because “it wasn’t a good idea especially if MDEQ did not choose Harcros.”
¶ 14. On August 29, 2003, MDEQ informed VCC that it had elected to continue negotiations with Harcros. Chisolm testified that he had considered the options thoroughly and remained open to all proposals submitted to MDEQ. Chisolm chose Harcros because it had more experience operating a chemical plant, had partnered with a well-known remediation specialist, and had proposed to build the golf course instead of selling the land to the City. And Hess testified that Harcros had pledged $8 million toward remediation, more than any other offer.
¶ 15. On January 12, 2005, PCI sued MDEQ and the City, alleging the RFP process was unfair because MDEQ abrogated its duty to select a buyer to the City and encouraged PCI to perform to *438 its detriment. [11], [12] PCI asserted several causes of action: breach of contract, tor-tious breach of contract, fraud, unjust enrichment, breach of duty of good faith and fair dealing, conspiracy, negligence, negligent misrepresentation, intentional misrepresentation, promissory estoppel, conspiracy, intentional interference with a contractual/business relationship, quantum meruit, and due process violations.[13] PCI & the City later settled out of court for an undisclosed amount and, thus, the City was dismissed from the case.
¶ 16. On January 24, 2006, MDEQ filed a motion to dismiss, or alternatively, motion for summary judgment, stating that PCI failed to exhaust its administrative remedies, failed to state a claim for which relief could be granted, failed to raise a genuine issue of material fact, and that MDEQ was immune from suit under the Mississippi Tort Claims Act (MTCA).[14] The trial court denied the motion.[15] MDEQ then filed a motion for interlocutory appeal, which this Court denied.[16] Prior to trial, MDEQ filed a motion in limine to exclude prejudicial and irrelevant evidence of its negotiations with Harcros, which occurred after the RFP deadline. The trial court denied this motion as well, thus, allowing PCI to present evidence of MDEQ’s and Harcros’s less-than-perfect negotiations.[17]
¶ 17. After a bench trial, the trial court found there was no adequate administrative remedy to address PCI’s claims; thus PCI did not have to exhaust its administrative remedies. The court determined that the RFP process was arbitrary and capricious, finding merit in PCI’s claims for breach of contract, breach of duty of good faith and fair dealing, promissory estoppel, and unjust enrichment. Accordingly, the trial court entered a judgment in favor of PCI for $500,000. Aggrieved, MDEQ filed its notice of appeal to this Court.
ANALYSIS
I. Request for Proposals
¶ 18. We accord deference to the findings of fact of a trial court, sitting without a jury. City of Jackson v. Powell, 917 So.2d 59, 68 (¶34) (Miss.2005). The Court will not reverse on appeal where those findings are supported by substantial evidence unless manifestly wrong, clearly *439 erroneous, or an erroneous legal standard was applied. Id. But we review questions of law de novo. Id.
¶ 19. This Court also reviews the grant or denial of a motion for summary judgment de novo. Whiting v. Univ. of S. Miss., 62 So.3d 907, 914 (¶ 9) (Miss.2011). Summary judgment is proper “if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law....” McGrath v. City of Gautier, 794 So.2d 983, 984 (¶ 6) (Miss.2001); see M.R.C.P. 56(c).
A. The RFP did not create a contract.
¶20. PCI claims that the RFP created a contract between it and MDEQ. Conversely, MDEQ argues no contract was created between the parties; thus, the trial court erred by denying its motion for summary judgment. We find that the RFP did not create a contract between the parties, and the trial court erred by denying the motion for summary judgment.
¶ 21. Unsuccessful bidders may sue when a contract award is unlawful pursuant to statutory authority. See City of Durant v. Laws Constr. Co., 721 So.2d 598 (Miss.1998). For example, unsuccessful bidders may sue under statutes requiring the state to select the lowest and best bidder. See Hemphill Constr. Co. v. City of Laurel, 760 So.2d 720 (Miss.2000). PCI relies on such case law to support its position, but PCI’s argument is misplaced. A statutory-bidding process and a request for proposals are not the same.
¶ 22. The RFP clearly stated it was not a formal bidding process, and the selected proposal would receive only the right to enter further negotiations. This Court has held that no breach-of-contract claim exists where no contract is created. In Whiting, a professor sued a university regarding its denial of her application for promotion and tenure. Whiting, 62 So.3d at 910-13 (¶¶ 2-3). The professor argued that (1) her breach-of-contract claim was not barred by the MTCA, (2) the Board violated her due process rights, and (3) other university professors acted in bad faith and attempted to sabotage her quest for tenure. Id. at 914-15 (¶ 10). The Court stated that a contract is not formed unless there is an “offer, acceptance, and consideration.” Id. at 915 (¶ 14). The faculty handbook did not guarantee her tenure, and the Board did not offer the professor a tenured position. Id. Thus, the Court held that no contract had been created. Id. at 915 (¶ 13). The Court also stated that:
While she attempts to characterize these claims as breach of contract, a fair reading of the facts of this case and the manner in which Dr. Whiting lays out her argument establish that if there were a claim to be made, it would be for tortious breach of contract and tortious interference with contract. As such, the claims made against the Board of the university are governed by the provisions of the MTCA.
Id. at 915 (¶ 15). Because the professor failed to exhaust her administrative remedies, the Court held the university immune from suit under the MTCA and affirmed the trial court’s grant of summary judgment. Id. at 919-20 (¶ 31).
¶23. To support its position, MDEQ cites analogous cases from other jurisdictions. In American Recycling Co. v. County of Manatee, 963 F.Supp. 1572 (M.D.Fla.1997), the county published an RFP requesting proposals for a recycling and waste management program. Id. at 1573. The county’s RFP stated that:
*440 There is no obligation on the part of the County to award the contract to the lowest proposer and the County reserves the right to award the contract to a proposer submitting a responsive proposal with a resulting negotiated agreement which is most advantageous and in the best interest of the County. The County shall be the sole judge of the proposal and the resulting negotiated agreement that is in its best interest and its decision shall be final.
Id. at 1573-74. American Recycling submitted its proposal, was identified as the lowest proposer, contacted to continue further negotiations, but ultimately was not selected by the county. Id. at 1574-77. American Recycling sued, alleging a breach-of-contract claim. Id. at 1578. The court found that the county was not mandated to engage in a competitive-bidding process. Id. at 1581-82. The county’s procurement code allowed it to simply request proposals. Id. Because there was no statutory-bidding process, the court stated, “one must look at the language of the RFP to determine if and when a contract is awarded.” Id. at 1581. Based on the RFP’s language, the court found no contract was created.
¶ 24. In a California case, a city published a RFP and reserved the right to determine which developer was qualified for the task. Old Town Dev. Corp. v. The Urban Renewal Agency of Monterey, 249 Cal.App.2d 313, 323, 57 Cal.Rptr. 426 (1967). It, like MDEQ, also reserved the right to reject any and all proposals and to negotiate with the developer it selected. Id. Because the RFP was not a solicitation for bids, the court found that it did not create an enforceable contract. Id. at 334-36, 57 Cal.Rptr. 426. The court stated that, in the absence of a viable contract, Old Town’s claims must be in tort, and any such claim is barred by the discretionary exemption. Id.
¶ 25. PCI attempts to characterize the RFP as an express contract. Under the RFP, even the selected proposal is not guaranteed a contract. As in Whiting, American Recycling, and Old Town, no contract was formed here. Thus, the trial court erred by finding that PCI had a viable breach-of-contract claim.
B. MDEQ’s decision was not arbitrary and capricious.
¶ 26. On appeal, there is a re-buttable presumption in favor of an administrative agency’s decision. Hinds County v. Miss. Comm’n on Envtl. Quality, 61 So.3d 877, 881 (¶ 10) (Miss.2011). The appellate court cannot substitute its judgment for that of the agency. Id. The challenging party must rebut the presumption. Id. This Court will not disturb an agency’s decision unless it “(1) was not supported by substantial evidence; (2) was arbitrary or capricious; (3) was beyond the power of the administrative agency to make; or (4) violated a statutory or constitutional right of the complaining party.” Id.
¶ 27. PCI argues that MDEQ did not have discretion to operate its RFP in an illegal, unfair, arbitrary and capricious manner. See Parker Bros. v. Crawford, 219 Miss. 199, 209, 68 So.2d 281, 285 (1953) (“[t]he award must be made reasonably, honestly, and in good faith....”)). MDEQ contends that there- is no proof that it conducted the process unfairly. Further, MDEQ argues that the trial court erred by imputing the City’s actions onto MDEQ, and evidence regarding what happened after the RFP process had concluded is irrelevant.
¶ 28. The Legislature created MDEQ “to conserve, manage, develop and protect our natural resources and wildlife....” Miss.Code Ann. § 49-2-1 (Rev.2012). The *441 Mississippi Commission on Environmental Quality (Commission) also exercises the duties and responsibilities associated with the Mississippi Air and Water Pollution Control Law through the MDEQ and is designated as the state’s pollution control agency. Miss.Code Ann. §§ 49-17-7; 49-17-3 (Rev.2012). MDEQ’s purpose is to supervise the cleanup of hazardous sites, and it may advise, consult or cooperate with public or private agencies or entities. Miss.Code Ann. § 49-17-17(c). MDEQ may also exercise its incidental powers necessary to carry out the purposes of Mississippi’s environmental laws. See Miss.Code Ann. § 49-17-17(n).
¶ 29. Although not stated specifically, MDEQ has jurisdiction and authority to advise the bankruptcy court and VCC regarding the transfer of the contaminated property. As stated in the AG’s opinion, no statutory law directs how MDEQ should have assisted VCC in finding a buyer capable of remediating its property. Thus, MDEQ was within its discretion to utilize an RFP process.
¶ 30. Within its discretion, MDEQ published its RFP and allowed Chisolm to choose which company MDEQ would negotiate with concerning the VCC property. PCI admits that MDEQ had discretion regarding whether to utilize the RFP process, but claims MDEQ did not have discretion to unfairly administer the process. PCI also claims that Hareros was not required to comply with the RFP requirements—specifically, to include a remediation time line in its proposal.
¶ 81. The trial court erred by finding that MDEQ conducted the RFP in an arbitrary and capricious manner. To the contrary, MDEQ’s decision was supported by substantial evidence. Chisolm chose Harcros’s proposal because it had more experience operating a chemical plant, had partnered with a well-known remediation specialist, had proposed to build the golf course (instead of selling the land to the City), and had pledged $8 million toward remediation, more than any other offer. Plus, PCI’s proposal contained several troubling provisions. PCI’s claim—that MDEQ unfairly administered the RFP—is not supported by the evidence. Thus, the trial court erred in its judgment.
II. Other Claims
¶ 32. The trial court found that PCI’s claims for breach of contract, breach of duty of good faith and fair dealing, promissory estoppel, and unjust enrichment were viable claims. MDEQ urges that PCI’s breach-of-contract claim is not a cognizable action, and its remaining claims must fail. Based on the Court’s resolution of the previous issue, we agree.
A. Breach of Duty of Good Faith and Fair Dealing
¶ 33. PCI claims it has an action for breach of duty of good faith and fair dealing. “All contracts contain an implied covenant of good faith and fair dealing in performance and enforcement.” Limbert v. Miss. Univ. for Women Alumnae Ass’n, Inc., 998 So.2d 993, 998 (¶ 11) (Miss.2008). But, without a contract, PCI cannot maintain a claim for breach of duty of good faith and fair dealing. Furthermore, PCI’s bad-faith claims focuses on the City’s actions. The trial court, in its ruling, also imported the City’s actions onto MDEQ. But the evidence shows that MDEQ was not involved in the City’s negotiations with Hareros. Also MDEQ consistently reminded the City that it was reviewing the proposals, conducting its own investigations, and selecting the prospective purchaser it felt was best to remediate the VCC property. The trial court erred by finding PCI had a viable *442 claim for breach of duty of good faith and fair dealing.
B. Promissory Estoppel
¶ 34. According to PCI, Chisolm made an oral promise to fairly consider its proposal. PCI claims it relied on Chi-solm’s promise to its detriment. Thus, PCI believes it has a viable promissory-estoppel claim.
¶ 35. An estoppel may arise from the making of a promise, even though without consideration, if it was intended that the promise should be relied upon and in fact it was relied upon, and if a refusal to enforce it would be virtually to sanction the perpetuation of fraud or would result in other injustice.” C.E. Frazier Constr. Co. v. Campbell Roofing & Metal Works, Inc., 373 So.2d 1036, 1038 (Miss.1979) (citation omitted). But there is no evidence that MDEQ did anything but fairly consider the proposals of all prospective purchasers. MDEQ states that, “Chisolm made no definite promises to PCI which could be reasonably expected to induce PCI to do anything other than make a proposal.” The RFP stated clearly that MDEQ was free to negotiate with whomever it preferred. PCI, on its own volition, took steps necessary to ensure it had a competitive proposal. And MDEQ should not be held liable for the costs of PCI’s due diligence. The trial court erred by ruling in favor of PCI on the promissory-estoppel claim.
C. Unjust Enrichment
¶ 36. “Unjust enrichment only applies to situations where there is no legal contract and ‘the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another.’ ” Powell v. Campbell, 912 So.2d 978, 982 (¶ 14) (Miss.2005) (citation omitted). PCI claims that MDEQ shared its due diligence with third parties, specifically Jacobs Entertainment. PCI references an email sent in March 2003, during the first round of the RFP process, from Hess to Jacobs Entertainment. The email referenced a company, which remained nameless, that had determined that it could remediate the property for $2.5 million. PCI believes this reference was to its proposed remediation cost.
¶ 37. According to Hess, PCI got that amount simply from a pre-existing corrective measure study, which was performed by VCC prior to its bankruptcy. The study listed remediation plans and cost, and this information was available to all companies. MDEQ denies disseminating any information from PCI’s proposal. MDEQ also maintains that PCI voluntarily submitted its proposal and conducted most of its due diligence prior to its publishing the RFP. According to MDEQ, “disappointed bidders, [who do work in their self-interest to facilitate a contract,] are not entitled to recover under unjust enrichment theory.” See Brady v. State, 965 P.2d 1, 14 (Alaska 1998). We agree and determine that the trial court erred in its finding of unjust enrichment.
D.Due Diligence
¶ 38. Lastly, MDEQ argues that the trial court erred by awarding PCI damages for costs associated with preparing its proposal. According to MDEQ, out-of-pocket expenses are only recoverable after a contract is formed. A company uses due diligence to investigate and evaluate a business opportunity. See, e.g., In re Jackson, 392 B.R. 666, 673 (Bankr.S.D.Miss.2008). This is a cost of doing business, which is incurred at the company’s own peril. Id. at 674 (finding the plaintiff conducted due diligence prior to purchasing the subject property at a fore *443 closure sale and voluntarily bore the risk regarding the incurred expenses). Because no contract was formed in this case, the trial court erred by awarding those damages to PCI.
CONCLUSION
¶ 39. The RFP did not create a contract between PCI and MDEQ. Furthermore, it was within MDEQ’s discretion to utilize an RFP process to determine which company was capable to remediate the contaminated property, and MDEQ’s decision was supported by the evidence. Accordingly, we find that the trial court erred by entering judgment against MDEQ. We reverse and render the trial court’s judgment, denying all relief sought by PCI and dismissing this action with prejudice.
¶ 40. REVERSED AND RENDERED.
WALLER, C. J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.

. Since 1992, the VCC facility had been under a consent decree stemming from a complaint filed by the United States Environmental Protection Agency (EPA), alleging violations of the Resource Conservation and Recovery Act and federal and state hazardous waste management laws and regulations.

. Scott Wilderman, PCI’s owner, stated during trial that PCI had monitored the bankruptcy proceeding for six months prior to the abandonment.

. A second facility, located in West Helena, Arkansas, was also abandoned in the action. The bankruptcy court also permitted the Arkansas Department of Environmental Quality to select the purchaser of that property.

. The bankruptcy code provides that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.” 11 U.S.C. § 554(a). The bankruptcy court found that the VCC facility was of inconsequential value and benefit to the estate and, thus, abandoned the property to the non-bankruptcy estate.

. A bankruptcy court may authorize the abandonment of contaminated property if it has formulated conditions "that will adequately protect the public’s health and safety." Midlantic Nat’l Bank v. N.J. Dep’t of Envtl. Prot., 474 U.S. 494, 506-07, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).

. In the RFP, MDEQ noted there was an existing consent decree between EPA and VCC, and the purchaser would be required to fulfill the requirements of that order.

. PCI is a chemical-trading and product-management company, which provides sales, marketing, logistics, technical and management services to chemical manufacturers. Prior to filing for bankruptcy, VCC was PCI’s client, and PCI “moved” the chemical plant’s byproducts.

.Harcros is a chemical distributor and manufacturer of ethoxylated and propoxylated products. At the time, it had twenty-eight locations in the United States.

. According to the RFP, proposals were not to exceed fifteen pages each.

. PCI also agreed to develop a golf course. But Thomas testified that the meeting was unsuccessful.

. PCI also claims that Harcros was not required to comply with the RFP's requirements. Specifically, PCI claims that Harcros did not include a remediation time line in its proposal. Harcros did not, but we note that the RFP only required a time line for "establishing beginning and completion of the business project (not including remediation activities).” PCI also claims that MDEQ knew the City did not want the plant in operation.

. PCI did not avail itself of its administrative remedies. PCI contends that there was no adequate administrative remedy available to it. And PCI claims that it did not learn that it had been treated unjustly until after the administrative-appeals deadline had passed.

. These claims appear in either PCI's original complaint or one of its three amended complaints.

. Miss.Code Ann. §§ 11-46-1 to -23 (Rev. 2002 & Supp.2012).

. MDEQ renewed its motion following PCI’s case-in-chief.

. See MDEQ v. Pacific Chlorine, Inc., No.2006-M-01135-SCT (Miss. July 27, 2006).

. PCI named this section of its brief "The Aftermath of the Harcros Selection,” submitting evidence that Harcros failed to execute the plan in its proposal. MDEQ explained that negotiations stalled for years once the EPA became involved, requiring numerous revisions to the Agreed Order for remediation. At the time of trial, no remediation or development had taken place on the VCC property.