# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-IA-00140-SCT

*THE MISSISSIPPI STATE PORT AUTHORITY AT GULFPORT*

*v.*

*YILPORT HOLDING A.S., YILPORT MISSISSIPPI CONTAINER TERMINAL MANAGEMENT LLC D/B/A YILPORT MISSISSIPPI AND YILPORT MISSISSIPPI CONTAINER TERMINAL MANAGEMENT II LLC D/B/A YILPORT GULFPORT*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/16/2024 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| TRIAL COURT ATTORNEYS: | MICHAEL BRANT PETTIS |
| | BEN HARRY STONE |
| | ALISON G. GETER |
| | CHRISTOPHER SOLOP |
| | JOHN KISSANE |
| | TIMOTHY JAMES ANZENBERGER |
| | LYNN PATTON THOMPSON |
| | SABIH SIDDIQI |
| | CELINDA JOAN METRO |
| | STEPHEN L. THOMAS |
| | SIMON TURNER BAILEY |
| | JAMES STEPHEN FRITZ, JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL BRANT PETTIS |
| | BEN HARRY STONE |
| | ALISON G. GETER |
| ATTORNEYS FOR APPELLEES: | LYNN PATTON THOMPSON |
| | ROSS DOUGLAS VAUGHN |
| | CHRISTOPHER SOLOP |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART; AND REMANDED - 08/14/2025 |
| MOTION FOR REHEARING FILED: | |

*YILPORT HOLDING A.S., YILPORT MISSISSIPPI*
*CONTAINER TERMINAL MANAGEMENT, LLC*
*D/B/A YILPORT MISSISSIPPI AND YILPORT*
*MISSISSIPPI CONTAINER TERMINAL*
*MANAGEMENT II, LLC D/B/A YILPORT*
*GULFPORT*

*v.*

*THE MISSISSIPPI STATE PORT AUTHORITY AT*
*GULFPORT*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/16/2024 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | CHRISTOPHER SOLOP |
| | LYNN PATTON THOMPSON |
| | ROSS DOUGLAS VAUGHN |
| ATTORNEYS FOR APPELLEE: | BEN HARRY STONE |
| | MICHAEL BRANT PETTIS |
| | ALISON G. GETER |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART; AND REMANDED - 08/14/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., MAXWELL AND GRIFFIS, JJ.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The Mississippi State Port Authority at Gulfport (Port Authority) and Yilport Holding

A.S. (Yilport) signed a letter of intent (LOI) concerning the potential expansion and

operation of the Port of Gulfport. After negotiations were unsuccessful, the Port Authority

initiated suit for declaratory and injunctive relief, and Yilport counterclaimed. The Port

Authority later changed course and filed a motion for summary judgment asserting as a defense Mississippi's minutes rule.

¶2. The trial court granted partial summary judgment and denied partial summary judgment, finding that the minutes rule applied, that the LOI at issue was not sufficiently spread upon the minutes, and that the LOI was, therefore, unenforceable. The trial court dismissed all claims pertaining to the LOI. The trial court allowed Yilport's claims of unjust enrichment and misappropriation of trade secrets to proceed. Thereafter, the Port Authority and Yilport each filed motions for interlocutory appeal. This Court granted both motions and consolidated the appeals.

## FACTS AND PROCEDURAL HISTORY

¶3. The Port Authority, an agency of the state of Mississippi, has the authority to manage, develop, and oversee the daily affairs of the Port of Gulfport for the benefit of the state and its residents.

¶4. Yilport Holding A.S. is a foreign corporation organized and existing under the laws of Turkey. Yilport Mississippi Container Terminal Management LLC d/b/a Yilport Mississippi and Yilport Mississippi Container Terminal Management II LLC d/b/a Yilport Gulfport are both Delaware limited-liability companies with their principal places of business in Pittsburgh, Pennsylvania. The entities will be collectively referred to as Yilport.

¶5. In September 2017, Yilport and the Port Authority entered into a LOI to potentially finance and construct a 160-acre expansion of the Port of Gulfport and to enter into a long-term, exclusive operating lease by the Port Authority to Yilport of the completed project site.

3

In February 2018, Yilport and the Port Authority signed a second LOI. On December 19, 2019, Yilport and the Port Authority entered into a third and final LOI for an operating agreement that evidenced the mutual intent of the parties to enter into discussions and negotiations regarding a potential agreement for operating certain areas and facilities situated on West Pier and North Harbor of the Port of Gulfport. The third LOI "supersed[ed] all other written or oral agreements and discussions between the Parties or their Representatives related thereto." The LOI included a provision under paragraph two providing that each party agreed to keep confidential all confidential information provided by the other party unless the party obtained prior written consent. Paragraph three stated that either party could terminate the LOI without recourse upon written notice to the other party at any time after 180 days after the date of the LOI.

¶6.     The LOI additionally included an exclusivity provision that stated:

5.     Exclusivity. The Port Authority agrees that it will not, during the longer of (a) 180 days from the date of this LOI or (b) the Term, consider, entertain, or take any action to elicit, initiate, encourage, or assist the submission of, any proposal, negotiation, or offer from any person or entity other than Yilport and its affiliates and subsidiaries relating to all or any part of the Potential Transaction, including but not limited to transactions which are inconsistent with the full performance in good faith by the Port Authority of any of the terms of Exhibit A. . . . The Port Authority undertakes to promptly notify Yilport of any written offer or potential agreement that is similar to the Potential Transaction.

It further provided:

7.     Legal Effect.

(a)     This LOI: (i) does not constitute a legally binding agreement, except for those provisions set forth in paragraph 7(b) below; (ii) does not constitute a legally binding offer or agreement to

4

consummate the Potential Transactions or any other transaction or enter into any agreement with respect to the Potential Transaction; and (iii) does not constitute the basis for an agreement by estoppel or otherwise.

(b)    The provisions of paragraphs 2, 3, 4, 5, 6, 7, and 8 of this LOI are legally binding upon the Parties and will survive the termination of this LOI.

¶7.    The minutes for the Port Authority's December 19, 2019, board of commissioners meeting reflected that a commissioner moved to "amend the agenda to include the consideration of a Letter of Intent for an Operating Agreement with YILPORT Holdings A.S." The commissioner then "moved to approve a Letter of Intent for an Operating Agreement with YILPORT Holdings A.S." The motion was unanimously approved.

¶8.    The parties extended the termination provision contained in the LOI several times. The June 18, 2020, board minutes reflected that a commissioner "moved to approve Amendment 1 to the Letter of Intent with YILPORT. Amendment 1 adds 180 days." The December 17, 2020, board minutes stated: "Commissioner Rester moved to amend the agenda to add the extension of the Letter of Intent with YILPORT. . . . Commissioner Rester moved to approve the extension of the Letter of Intent with YILPORT through January 31, 2021."[1] Lastly, the January 5, 2021, minutes stated that a commissioner had "moved to approve an extension to the Letter of Intent between YILPORT and the MS State Port Authority with a new expiration date of February 28, 2021." The extensions were each

---

[1] An agenda for the December 2020 meeting indicated that the LOI was an attachment to the agenda.

approved. The last extension provided that either party may terminate the LOI at any time after February 28, 2021.

¶9.    On March 24, 2021, the Port Authority named Jon Nass as its new CEO and executive director.

¶10.    On May 12, 2021, during a special meeting, the board of commissioners moved to enter an executive session to discuss legal matters: "Lease negotiations with YILPORT[.]" The minutes reflect that no action was taken.

¶11.    On November 16, 2021, the Port Authority notified Yilport that it was terminating the LOI.

¶12.    On March 11, 2022, Yilport provided a notice of claim letter to Nass pursuant to the Mississippi Tort Claims Act (MTCA), alleging that it had suffered injury as a result of the Port Authority's termination of the LOI. Yilport stated its intent to seek money damages in excess of $30,000,000.

¶13.    On April 19, 2022, a mediator with the Mediation Department of the Ministry of Justice of Turkey wrote to the Port Authority regarding a mediation meeting in an attempt to peacefully resolve the dispute arising from the termination of the LOI. The Port Authority stated that a mediation application is a prerequisite to initiating suit in Turkey.

¶14.    On June 6, 2022, the Port Authority filed a complaint for declaratory judgment and injunctive relief against Yilport, requesting that the trial court enter an order declaring that Mississippi courts have exclusive jurisdiction over Yilport's alleged tort claims, declaring that Yilport's tort claims must fail under the discretionary function exception to the MTCA

6

and under the agreed terms in the LOI, and declaring that the Port Authority had not breached the terms of the LOI.

¶15.    Yilport filed a counterclaim against the Port Authority asserting claims of breach of contract, breach of the implied covenant of good faith and fair dealing, quantum meruit, unjust enrichment, and misappropriation of trade secrets. Yilport claimed that it had incurred a monetary loss and injury of not less than $8,500,000 for costs and efforts associated with Yilport's work relating to the LOI. Yilport further asserted that it had incurred a loss of profit of not less than $30,000,000.

¶16.    In response, the Port Authority filed a motion to partially dismiss and for declaratory judgment. Yilport argued that the Port Authority's motion to partially dismiss was premature. It alleged that the Port Authority had discussed and accepted proposals with multiple developers, including Ports America, Inc., for the use or operation of the Port prior to the Port Authority's termination of the LOI in violation of the LOI's exclusivity clause. Yilport argued that if the MTCA applied to its misappropriation-of-trade-secrets claim, the notice of claim put the Port Authority on sufficient notice. Moreover, Yilport alleged that the meetings between Ports America and the Port Authority could have contained the Yilport/Port Authority operating agreement and Yilport's master plan for development of the port and that Yilport is entitled to complete discovery before any of its claims against the Port Authority were subjected to judicial determination.

¶17.    Yilport issued subpoenas duces tecum to Ports America directing, inter alia, that Ports America produce all communications and/or documents exchanged between Ports America and representatives of the Port Authority during the relevant time periods.

¶18.    Ports America filed a motion to quash the subpoenas issued at Yilport's request and argued that the LOI was not sufficiently recorded on the Port Authority's board minutes and, therefore, was not enforceable.

¶19.    Subsequently, the Port Authority moved to amend its answer to Yilport's counterclaim to add a defense based on the minutes rule. The Port Authority then dropped its motion to dismiss and opted to file a motion for summary judgment based on the minutes rule and, alternatively, the applicability of the MTCA to Yilport's claims.

¶20.    On June 16, 2023, the trial court held a hearing on the Port Authority's motion for summary judgment, on its motion to amend its answer, and on the motion to quash subpoenas filed by Ports America. The trial court denied the Port Authority's motion to amend as being unnecessary because the minutes rule is not considered an affirmative defense. The trial court also found that any tort claims involved in the case would be governed by the MTCA. The trial court, in its very thorough opinion, ultimately determined that the LOI was not properly spread upon the board's minutes and, consequently, that it was not enforceable under the minutes rule. Further, the trial court held that the Open Meetings Act does not conflict with the minutes rule and that the two can be applied in harmony. It dismissed all claims in the complaint and cross-complaint relating to the LOI, including Yilport's claims for breach of contract, breach of the implied duty of good faith and fair dealing, and quantum meruit. The

court recognized the harshness of the minutes rule but found that it was bound by this Court's precedent.

¶21. The trial court found that Yilport's unjust enrichment claim survived for any claims outside of those contemplated under the LOI. The trial court also allowed Yilport to proceed with its misappropriation-of-trade-secrets claim.

¶22. This Court granted both Yilport's and the Port Authority's petitions for interlocutory appeal and consolidated the matters. Yilport raises three issues:

    1.      Whether the Open Meetings Act supersedes the minutes rule.

    2.      Whether the Port Authority is estopped from asserting the minutes rule as a defense.

    3.      Whether the minutes rule is immutable.

The Port Authority raises three issues:

    1.      Whether the trial court correctly applied the doctrine of the minutes rule.

    2.      Whether an unjust-enrichment claim may prevail over the minutes rule.

    3.      Whether Yilport provided sufficient notice under the MTCA of its misappropriation-of-trade-secrets claim.

## ANALYSIS

¶23. This Court reviews the grant or denial of summary judgment de novo. *Singing River MOB, LLC v. Jackson Cnty.*, 342 So. 3d 140, 146 (Miss. 2021) (citing *Dalton v. Cellular S., Inc.*, 20 So. 3d 1227, 1231 (Miss. 2009)). The motion should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits,

9

if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c).

**I.      Whether the trial court correctly applied the minutes rule.**

¶24.    This Court recently reaffirmed its long-standing holding that "public boards speak only through their minutes and their actions are evidenced solely by entries on the minutes." ***Hous. Auth. of Yazoo City v. Billings***, 404 So. 3d 1148, 1151 (Miss. 2025) (internal quotation marks omitted) (quoting ***Thompson v. Jones Cnty. Cmty. Hosp.***, 352 So. 2d 795, 796 (Miss. 1977)). "Otherwise, an individual member of the board or agent thereof would be capable of binding the board and expending the public taxpayers' money without the benefit of the consent of the board as a whole which was elected and responsible for such purposes." ***Butler v. Bd. of Supervisors for Hinds Cnty.***, 659 So. 2d 578, 579 (Miss. 1995). The minutes rule has been in effect since at least 1881. *See **Bridges & Hill v. Clay Cnty. Supervisors***, 58 Miss. 817, 820 (1881).

¶25.    The standard for complying with the minutes rule is as follows:

> [A]ny public board in the State of Mississippi[] speaks and acts only through its minutes . . . . And where a public board engages in business with another entity, no contract can be implied or presumed, it must be stated in express terms and recorded on the official minutes and the action of the board . . . .
>
> However, the entire contract need not be placed on the minutes. Instead, it may be enforced where enough of the terms and conditions of the contract are contained in the minutes for determination of the liabilities and obligations of the contracting parties without the necessity of resorting to other evidence.

***KPMG, LLP v. Singing River Health Sys.***, 283 So. 3d 662, 670 (Miss. 2018) (quoting ***Wellness, Inc. v. Pearl River Cnty. Hosp.***, 178 So. 3d 1287, 1290-91 (Miss. 2015)). "Such

10

contracts when so entered upon the minutes may not be varied by parol nor altered by a court of equity[.]" ***Butler***, 659 So. 2d at 581 (internal quotation mark omitted) (quoting ***Warren Cnty. Port Comm'n v. Farrell Constr. Co.***, 395 F.2d 901, 903-04 (5th Cir. 1968)).

### A. Whether the Open Meetings Act supplanted the minutes rule.

¶26.   "If the words of a statute are clear and unambiguous, the Court applies the plain meaning of the statute and refrains from using principles of statutory construction." ***Bd. of Supervisors of Jackson Cnty. v. Qualite Sports Lighting, LLC***, 337 So. 3d 1040, 1043 (Miss. 2022) (internal quotation marks omitted) (quoting ***Am. Tower Asset Sub, LLC v. Marshall Cnty.***, 324 So. 3d 300, 302 (Miss. 2021)). Additionally, "[t]his Court 'cannot . . . add to the plain meaning of the statute or presume that the legislature failed to state something other than what was plainly stated.'" ***Id.*** (second alteration in original) (internal quotation marks omitted) (quoting ***Am. Tower***, 324 So. 3d at 302).

¶27.   Yilport argues that the minutes rule is antiquated and was supplanted by the Open Meetings Act. The Open Meetings Act was enacted by the legislature and became effective in 1976. ***Mayor & Aldermen of Vicksburg v. Vicksburg Printing & Publ'g Co.***, 434 So. 2d 1333, 1334 (Miss. 1983); Miss. Code Ann. §§ 25-41-1 to -17 (Rev. 2024). "The Open Meetings Act was enacted for the benefit of the public" because " [o]penness in government is the public policy of this State." ***Bd. of Trs. of State Insts. of Higher Learning v. Miss. Publishers Corp.***, 478 So. 2d 269, 276 (Miss. 1985) (internal quotation marks omitted) (quoting ***Vicksburg Printing & Publ'g***, 434 So. 2d at 1336). The legislative statement accompanying the act provides that:

It being essential to the fundamental philosophy of the American constitutional form of representative government and to the maintenance of a democratic society that public business be performed in an open and public manner, and that citizens be advised of and be aware of the performance of public officials and the deliberations and decisions that go into the making of public policy, it is hereby declared to be the policy of the State of Mississippi that the formation and determination of public policy is public business and shall be conducted at open meetings except as otherwise provided herein.

Miss. Code Ann. § 25-41-1 (Rev. 2024).

The Open Meetings Act requires a public body to keep minutes of all meetings,

whether in open or executive session, showing the members present and absent; the date, time and place of the meeting; an accurate recording of any final actions taken at such meeting; and a record, by individual member, of any votes taken; and any other information that the public body requests to be included or reflected in the minutes.

Miss. Code Ann. § 25-41-11(1) (Rev. 2024). The act further requires that

An agenda and materials that will be distributed to members of the public body and that have been made available to the staff of the public body in sufficient time for duplication and forwarding to the members of the public body shall be made available to the public at the time of the meeting.

Miss. Code Ann. § 25-41-5(2) (Rev. 2024).

¶28. This Court has recognized that "a new statute will not be considered as reversing long-established principles of law and equity unless the legislative intention to do so clearly appears." *Qualite Sports Lighting*, 337 So. 3d at 1044 (internal quotation marks omitted) (quoting *Lawson v. Honeywell Int'l, Inc.*, 75 So. 3d 1024, 1029 (Miss. Ct. App. 2011)). Yilport asserts that the plain language of Section 25-41-11(1) is clear that the burden is on the public body to ensure meeting minutes contain all that is required by the law and that any information beyond what is required in that section is optional and to be determined by the

public body. The Port Authority disagrees and argues that the minutes rule and the Open Meetings Act do not conflict and that both apply when an entity contracts with a state agency.

¶29. We agree with the trial court's conclusion that there is neither conflict with nor superseding of the minutes rule by the Open Meetings Act. "First, we presume that the legislature, when it passes a statute, knows the existing laws." *Arant v. Hubbard*, 824 So. 2d 611, 615 (Miss. 2002) (internal quotation marks omitted) (quoting *Daou v. Harris*, 678 P.2d 934, 938 (1984)). The minutes rule had been in effect long before the Open Meetings Act was enacted. As the trial court stated, at no point has the Open Meetings Act ever referred to the minutes rule or made any provision or requirements related to the subject matter of the minutes rule.

¶30. Thus, the Open Meetings Act does not include a clear legislative intention to reverse the minutes rule, which has been enforced for well over a century. As previously stated, the purpose of the Open Meetings Act is to ensure that "public business be performed in an open and public manner, and that citizens be advised of and be aware of the performance of public officials and the deliberations and decisions that go into the making of public policy . . . ." § 25-41-1. Similarly, this Court has described the purpose of the minutes rule as:

> (1) That when authority is conferred upon a board, the public is entitled to the judgment of the board after an examination of a proposal and a discussion of it among the members to the end that the result reached will represent the wisdom of the majority rather than the opinion or preference of some individual member; and
>
> (2) that the decision or order when made shall not be subject to the uncertainties of the recollection of individual witnesses of what transpired, but that the action taken will be evidenced by a written memorial entered upon the

minutes at the time, *and to which the public may have access to see what was actually done.*

**KPMG**, 283 So. 3d at 673 (quoting **Wellness, Inc.**, 178 So. 3d at 1293).

¶31.   The Open Meetings Act applies to any actions of a state agency. It lists the statutory requirements for the minutes of meetings of a public body, including that the minutes reflect

> whether in open or executive session, showing the members present and absent; the date, time and place of the meeting; an accurate recording of any final actions taken at such meeting; and a record, by individual member, of any votes taken; and any other information that the public body requests be included or reflected in the minutes.

§ 25-41-11(1). The Open Meetings Act pertains to the minutiae of public meetings. And the minutes rule does not conflict with those requirements. In harmony with the Open Meetings Act, the minutes rule furthers the Open Meetings Act's purpose of openness by requiring that a contract with a public board "be stated in express terms and recorded on the official minutes . . . ." **KPMG**, 283 So. 3d at 673 (internal quotation mark omitted) (quoting **Wellness, Inc.**, 178 So. 3d at 1291).

¶32.   Eliminating the minutes rule would lead to less transparency and accountability for public bodies, which would be contrary to the stated purpose of the Open Meetings Act. The Open Meetings Act sets the minimum requirements for the minutes of a public body, and the minutes rule imposes additional requirements on a contracting public body. Yilport has failed to show that the Open Meetings Act reflects a clear legislative intent to reverse the minutes rule or that the Open Meetings Act and minutes rule conflict.

¶33.   Yilport further argues that the burden is on the public body to ensure meeting minutes contain all that is required by law. It cites an attorney general opinion: "the Board of

14

Aldermen has the ultimate authority to determine what should be included and what should be omitted from the minutes so long as the statutory requirements of Miss. Code Ann. Section 25-41-11 are met." Miss. Att'y Gen. Op., No. 2011-00026, 2011 WL 1114300, *Barton* (Feb. 18, 2011). Yet that opinion was based on whether the name of an employee discussed during an executive session should be placed in the official minutes and did not involve any contractual obligation that would invoke the minutes rule. *Id.* Concerning the minutes rule, this Court repeatedly has held that "it is the responsibility of the entity contracting with the Board, not the responsibility of the Board itself, to ensure that the contract is legal and properly recorded on the minutes of the board." *KPMG*, 283 So. 3d at 670 (internal quotation mark omitted) (quoting *Wellness, Inc.*, 178 So. 3d at 1291).

¶34.    The trial court recognized that its holding produced a harsh result. And this Court has recognized the same regarding the application of the minutes rule. *Singing River MOB*, 342 So. 3d at 153 n.14 (citing *Urb. Devs. LLC v. City of Jackson, Miss.*, 468 F.3d 281, 300 (5th Cir. 2006)). It "ha[s], however, repeatedly provided the simple solution: if you deal with public boards, you must assure that your contracts are recorded in the board minutes." *Id.* (citing *KPMG*, 283 So. 3d at 669). As this Court stated in *Wellness, Inc.*,

> Wellness had a clear and well-established duty to ensure that sufficient terms of its contract with the hospital were spread upon the Board's minutes. Its failure to fulfill its own duty does not entitle it to an exception from the enforcement of a well-established policy that allows members of the tax-paying public to consult a Board's minutes to "see what was actually done." *Lee Cnty. v. James*, 178 Miss. 554, 174 So. 76, 77 (1937). "[T]he importance of the public policy involved will be the overriding factor in such disputes even when the rule may work an apparent injustice." *Butler*, 659 So. 2d at 582.

*Wellness, Inc.*, 178 So. 3d at 1293 (citation modified).

¶35. Yilport acknowledges but attempts to distinguish this Court's recent decisions involving the minutes rule. In **KPMG**, Singing River's former chief financial officer (CFO) signed engagement letters issued by KPMG for auditing services for five fiscal years, 2008 to 2012. **KPMG**, 283 So. 3d at 664. Singing River's audit and compliance committee met to discuss KPMG's engagement letter. **Id.** at 665. The 2008 committee minutes reflected that the CFO had "reviewed the Engagement Letter for the Fiscal Year 2008 audit by KPMG" and that the committee had unanimously voted to approve the engagement letter. **Id.** The minutes were "silent as to the terms and conditions of KPMG's 2008 proposal," and the letters were not attached to the committee minutes. **Id.** The board minutes noted that the committee had approved the 2008 engagement letter, "copies of which were included in the agendas in advance of the meeting." **Id.** The board minutes stated that the board had "voted unanimously to approve the minutes of the [committee] meeting . . . and fiscal year 2008 Engagement Letter with KPMG, as presented and included in the minutes by reference." **Id.** The 2008 board minutes did not reflect any terms or conditions of the engagement letter. **Id.** The 2009 board minutes also "failed to include a single term and/or condition of the 2009 [engagement] letter in its minutes." **Id.** at 667. The 2009 minutes stated that the "Board unanimously approved the fiscal year 2009 Engagement Letter . . . ." **Id.** The 2010 to 2012 board minutes did not reference any board action regarding the engagement letters. **Id.**

¶36. Although the hospital did not dispute that it signed the engagement letters to conduct audit services, this Court held that "Singing River cannot stipulate that which is prohibited by law." **Id.** at 673. This Court found that the committee minutes also were not admissible

evidence of the contracts because the minutes rule requires that the board minutes reflect the contract terms. *Id.* This Court unanimously concluded that

> KPMG's proposals for 2008 through 2012, including the attached dispute-resolution provisions, are unenforceable because the Board's minutes failed to include enough terms and conditions of the KPMG letters and attachments; accordingly, determining the obligations and liabilities of both parties under those agreements is impossible.

*Id.* at 674.

¶37. Here, the December 19, 2019, board minutes reflect:

> Commissioner Simpson moved to suspend the rules and amend the agenda to include the consideration of a Letter of Intent for an Operating Agreement with YILPORT Holdings. A.S. Commissioner Rester seconded and the motion was unanimously approved.

> Commissioner Simpson moved to approve a Letter of Intent for an Operating Agreement with YILPORT Holdings A.S. Commissioner Rester seconded and the motion was unanimously approved.

Like *KPMG*, the board minutes in this case do not include any term or condition of the LOI. The minutes merely reflect that the board approved *a* letter of intent for an operating agreement. It neither specifies which letter of intent was approved nor contains any information to enable a determination of the liabilities and obligations of the contracting parties. Therefore, we find no merit in Yilport's attempt to distinguish the case at issue from *KPMG*.

¶38. Yilport also cites *Warnock & Associates, LLC v. City of Canton*, 328 So. 3d 1254 (Miss. Ct. App. 2021), which is not binding authority to this Court. Even so, in that case, Warnock attempted to collect on thirteen invoices pursuant to a professional services agreement with the city of Canton. *Id.* at 1257. Yet Warnock failed to provide any evidence

"that any part of that agreement was ever entered on the minutes of the Board of Aldermen." *Id.* at 1260. Although the board minutes involved in this case reflect that the board approved the letter of intent with Yilport, it still failed to contain "enough of the terms and conditions of the contract . . . for determination of the liabilities and obligations of the contracting parties without the necessity of resorting to other evidence." *Id.* (internal quotation marks omitted) (quoting *Thompson*, 352 So. 2d at 796). Accordingly, the trial court did not err by finding that the minutes rule applied, that the LOI was not properly spread upon the minutes of the Board, and that the LOI is unenforceable as a result.

**B.     Whether the Port Authority is estopped from asserting that the minutes rule bars Yilport's claims**.

¶39.    Yilport next argues that the Port Authority is precluded by judicial estoppel from taking inconsistent positions in litigation. Yilport points out that the Port Authority has clearly changed its position by first initiating suit against Yilport to assert that the LOI was valid and subsequently claiming that the LOI was invalid for failure to comply with the minutes rule. We agree with the trial court's conclusion:

> The troubling situation in this case is the fact that the Port initiated this litigation relying entirely on the existence and validity of the LOI. . . . Yet now, it seeks dismissal of the Counterclaim based on its repudiation of that LOI based on the [m]inutes [r]ule. As unfair and counterintuitive as it seems, however, the [m]inutes [r]ule gives no quarter on the issue.

¶40.    This Court has repeatedly applied the minutes rule in situations in which a public body filed suit to enforce a contract. In *Jackson County v. KPMG, LLP*, 278 So. 3d 1124, 1125 (Miss. 2019), KPMG sought "to enforce the *very same* arbitration agreements attached to the *very same* engagement letters with Singing River—but this time the entity against which

18

KPMG seeks arbitration enforcement is Jackson County, Mississippi, which acted as Singing River's bond guarantor." Jackson County had initiated suit against KPMG for its alleged failure to conduct audits of Singing River pursuant to its contractual duties. *Id.* But when KPMG filed a motion to compel arbitration, Jackson County asserted the minutes rule and claimed that no enforceable contract ever came into existence. *Id.* at 1126. This Court agreed and again found that it could not enforce the engagement letters. *Id.* at 1128; *see also KPMG*, 283 So. 3d at 664.

¶41.   Also, in *Wellness, Inc.*, Pearl River County Hospital sued Wellness for breach of contract. *Wellness, Inc.*, 178 So. 3d at 1289. After Wellness attempted to enforce the arbitration agreement in the contract, the hospital responded that a valid contract did not exist due to the minutes rule, and this Court agreed. *Id.* at 1290, 1292. This Court rejected Wellness's argument that

> because the Board discussed the Agreement on the minutes multiple times; because the Board members testified at depositions that the Agreement was ultimately approved; and because Wellness received payments from the Board, that the Board clearly intended to ratify the Wellness Agreement, and so Wellness is entitled to an exception from the minutes requirement.

*Id.* at 1293.

¶42.   Again, a public body "cannot stipulate that which is prohibited by law." *KPMG*, 283 So. 3d at 673. Because the LOI was not sufficiently spread upon the board minutes, the minutes rule renders it unenforceable. Moreover, an element of judicial estoppel is that "a court accepted the previous position[.]" *Clark v. Neese*, 131 So. 3d 556, 560 (Miss. 2013) (quoting *Kirk v. Pope*, 973 So. 2d 981, 991 (Miss. 2007)). Here, the trial court had not

19

accepted the Port Authority's arguments that the LOI was enforceable; thus, judicial estoppel does not apply. And as to equitable estoppel, this Court has expressly held that "equitable estoppel is not a proper course of action when the minutes rule has not been satisfied." *Singing River MOB*, 342 So. 3d at 153 (citing *KPMG*, 283 So. 3d at 675-76). In sum, this issue lacks merit.

### C. Whether application of the minutes rule would perpetuate error.

¶43. Yilport contends that the minutes rule is not immutable and urges this Court to apply the reasoning laid out in *Community Extended Care Centers, Inc. v. Board of Supervisors for Humphreys County*, 756 So. 2d 798 (Miss. Ct. App. 1999). There, the Court of Appeals was tasked to decide "[w]hether the failure to attach a contract to the original board minutes is rectified by the contract's appearing in the same chancery clerk's office in the deed records and the parties' subsequent affirmative acts." *Id.* at 801. The Court of Appeals found that the

> technical omission of spreading the lease contract on the minutes of the Board did not invalidate the lease contract inasmuch as the lease contract was recorded in the land records of the chancery clerk and the parties to the contract had fulfilled the requirements of the contract for thirteen years.

*Id.* at 802. This was in large part because the chancery clerk maintained the minute books and records of the board of supervisors, and "the lease contract was filed in the land records of the chancery clerk" less than two weeks after the adoption of the resolution. *Id.* The Court of Appeals emphasized that the facts of the case did not involve an oral contract with express terms that were not recorded in the chancery clerk's records. *Id.* at 803. Instead, "[w]hat the board had approved was immediately viewable by the public and was in no way uncertain or hidden." *Id.* at 802.

20

¶44. The same reasoning cannot be applied in this case. The terms and conditions of the LOI were not entered in the minutes of the board, and there was no filing of the LOI that allowed it to be immediately viewable by the public. Therefore, its terms remained uncertain, and Yilport does not avoid the longstanding requirements of the minutes rule.

¶45. Yilport additionally argues for the first time on appeal that the minutes rule should not apply when a state agency meets in executive session. It also argues that the Port Authority bore the responsibility to ensure that the LOI was recorded on the minutes because the LOI was distributed at a public meeting and because the Port Authority initiated the LOI. However, "[i]t is a well-settled proposition that this Court will not review matters on appeal that were not considered by the lower court." *Boyles v. Miss. State Oil & Gas Bd.*, 794 So. 2d 149, 153 (Miss. 2001) (citing *One (1) 1979 Ford 15V v. State ex rel. Miss. Bureau of Narcotics*, 721 So. 2d 631, 637 (Miss. 1998)). Therefore, we decline to address those issues.

## II. Whether the trial court correctly denied summary judgment as to Yilport's unjust-enrichment claim.

¶46. The trial court found that Yilport's unjust-enrichment claim could be brought in the absence of a written contract and that it is not barred by any statute or law. Therefore, it held that Yilport's unjust-enrichment claim survived as to the actual negotiations and activities but not as to the LOI itself.

¶47. "'Unjust enrichment' and 'restitution' are modern designation for the doctrine of 'quasi-contracts[.]'" *Koval v. Koval*, 576 So. 2d 134, 136 (Miss. 1991) (quoting *Magnolia Fed. Sav. & Loan Ass'n v. Randal Craft Realty*, 342 So. 2d 1308 (Miss. 1977)). "Unjust enrichment is an equitable remedy closely associated with 'implied contracts' and trusts."

21

***Est. of Johnson v. Adkins***, 513 So. 2d 922, 926 (Miss. 1987). It "only applies to situations where there is no legal contract and 'the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another.'" ***Miss. Dep't of Env't Quality v. Pac. Chlorine, Inc.***, 100 So. 3d 432, 442 (Miss. 2012) (internal quotation mark omitted) (quoting ***Powell v. Campbell***, 912 So. 2d 978, 982 (Miss. 2005)). "[R]ecovery in unjust enrichment is that to which the claimant is equitably entitled." ***Koval***, 576 So. 2d at 136 (quoting ***Est. of Johnson***, 513 So. 2d at 926).

¶48.    The Port Authority argues that unjust enrichment is an implied contract claim comparable to quantum meruit and is not an exception to the minutes rule. We agree. In ***Wellness, Inc.***, this Court held that "where a public board engages in business with another entity, '[n]o contract can be implied or presumed[;] it must be stated in express terms and recorded on the official minutes and the action of the board[.]'" ***Wellness, Inc.***, 178 So. 3d at 1291 (first and third alterations in original) (quoting ***Burt v. Calhoun***, 231 So. 2d 496, 499 (Miss. 1970)).

¶49.    Yilport argues that the trial court properly determined that its unjust-enrichment claim falls under the category of an implied-in-law contract cause of action. It cites ***1704 21st Avenue, Ltd. v. City of Gulfport***, 988 So. 2d 412, 417 (Miss. Ct. App. 2008). There, the Court of Appeals held that unjust enrichment claims are governed exclusively by the MTCA and that governmental immunity provided under the MTCA is waived under Mississippi Code Section 11-46-3(1). ***Id.*** (citing ***City of Jackson v. Est. of Stewart ex rel. Womack***, 908 So. 2d 703, 711 (Miss. 2005)).

22

¶50. This Court previously has analyzed section 344 of the Code of 1892 and found that it was

> express in its provision that "a board of supervisors shall not empower or authorize any one or more members of such board or other person to let or make contracts for the building or erection of public works of any description, or for working public roads, in vacation or during the recess of said board; but all such contracts shall be made and approved by said board in open session."

*Groton Bridge & Mfg. Co. v. Bd. of Supervisors of Warren Cnty.*, 80 Miss. 214, 31 So. 711, 712 (1902). The Court held that "[i]t is plain from this that a county cannot, as to the subject-matters covered by section 344, be bound by an implied contract." *Id.*

¶51. In 1921, this Court reiterated that "it is manifest that the board of supervisors of a county can only enter into an express contract by an order spread upon its minutes"; therefore, "no recovery can be had under claim of an implied contract." *Smith Cnty. v. Mangum*, 127 Miss. 192, 89 So. 913, 914-15 (1921); *see also Amite Cnty. v. Mills*, 138 Miss. 222, 102 So. 465, 466 (1925). Again in 1932, this Court determined that vehicles "purchased by or with the approval of individual members of the board of supervisors" were not valid express contracts and thus, "a county cannot be held liable under an implied contract to pay." *Attala Cnty. v. Miss. Tractor & Equip. Co.*, 162 Miss. 564, 139 So. 628, 628 (1932) (citing *Mangum*, 89 So. at 914-15; *Mills*, 102 So. at 466).

¶52. Because unjust enrichment is an implied-contract claim, it falls under the minutes rule. Resultantly, Yilport's unjust-enrichment claim also fails because the terms and conditions of the LOI were not sufficiently spread on the minutes. We reverse the judgment of the trial court related to Yilport's claims of unjust enrichment.

23

**III.   Whether Yilport provided sufficient notice under the MTCA of its misappropriation-of-trade-secrets claim.**

¶53.   Lastly, the Port Authority argues that Yilport's notice of claim failed to include any allegations that it believed that the Port Authority had shared any of Yilport's information with anyone. Therefore, it argues that Yilport failed to substantially comply with the MTCA's notice requirement as to its misappropriation-of-trade-secrets claim.

¶54.   The MTCA requires that a party "at least ninety (90) days before instituting suit . . . must file a notice of claim with the chief executive officer of the governmental entity." Miss. Code Ann. § 11-46-11(1) (Rev. 2019). The notice must

> (iii) Contain a short and plain statement of the facts upon which the claim is based, including the circumstances which brought about the injury, the extent of the injury, the time and place the injury occurred, the names of all persons known to be involved, the amount of money damages sought, and the residence of the person making the claim at the time of the injury and at the time of filing the notice.

Miss. Code Ann. § 11-46-11(2)(b)(iii) (Rev. 2019). "[T]he purpose of the Act is to insure that governmental boards, commissioners, and agencies are informed of claims against them." *Lee v. Mem'l Hosp. at Gulfport*, 999 So. 2d 1263, 1265 (Miss. 2008) (internal quotation mark omitted) (quoting *Reaves ex rel. Rouse v. Randall*, 729 So. 2d 1237, 1240 (Miss. 1998)).

¶55.   "The standard employed by this Court requires substantial compliance with the notice requirements of the MTCA." *S. Cent. Reg'l Med. Ctr. v. Guffy*, 930 So. 2d 1252, 1255 (Miss. 2006) (citing *McNair v. Univ. of Miss. Med. Ctr.*, 742 So. 2d 1078, 1080 (Miss. 1999)). "What constitutes substantial compliance, while not a question of fact but one of law,

24

is a fact-sensitive determination." *Lee*, 999 So. 2d at 1267 (internal quotation marks omitted)

(quoting *Carr v. Town of Shubuta*, 733 So. 2d 261, 263 (Miss. 1999), *overruled in part by*

*Stuart v. Univ. of Miss. Med. Ctr.*, 21 So. 3d 544, 549 (Miss. 2009)).

> [C]onfusion has arisen in the discussion of Miss. Code Ann. § 11-46-11(2), as to how much information is required by this Court under each of the seven categories to comply with Miss. Code Ann. § 11-46-11(2). As a practical example, the first category requires notice of the "circumstances which brought about the injury." In order to comply with this requirement, the notice need not disclose every single fact, figure and detail, but rather the substantial details, in order to comply with the requirements of Miss. Code Ann. § 11-46-11(2). But, the failure to provide *any* of the seven statutorily required categories of information falls short of the statutory requirement and amounts to non-compliance with Miss. Code Ann. § 11-46-11(2). However, where some information in each of the seven required categories is provided, this Court must determine whether the information is "substantial" enough to be in compliance with the statute. If it is, the result is "compliance," not "substantial compliance" with the requirements under Miss. Code Ann. § 11-46-11(2).

*Guffy*, 930 So. 2d at 1258.

¶56. On March 11, 2022, Yilport provided a notice of claim stating, in relevant part, as

follows:

> **II.     The Port Authority's Breach of Exclusivity**
>
> The Port Authority's management changed during June 2021 resulting in the appointment of a new Chief Executive Officer and Director of the Port, Jon Nass. Upon information and belief, Mr. Nass had been previously responsible for container port development and had significant contacts with contractors, financiers and other parties that conduct the same or similar business as that contemplated by the Transaction.
>
> Further, Yilport has been informed by third parties from Mississippi and Washington D.C., that Ports America, a direct competitor of Yilport, has retained several lobbyists that have met with Mississippi senators in relation to projects at the Port. Those same lobbyists are also disparaging Yilport. Additionally, Yilport has been informed that Ports America has met with the

25

> Port Authority in relation to operation of the Port. Ports America provides stevedoring and other services at the Port of Portland, Maine. Mr. Nass was previously the Chief Executive Officer of the Maine Port Authority.
>
> Upon information and belief, this led to violations of the exclusivity provisions of the LOI by the Port Authority.

The notice additionally stated that

> the Port Authority failed to negotiate in good faith and instead abruptly terminated the LOI, and now, contrary to justified expectation, the Port Authority is entertaining proposals made by third parties in respect of the Port; all the while, having benefit[t]ed from the resources devoted by Yilport and the years of work product produced by Yilport.

¶57. We agree with the trial court's reasoning that Yilport's notice of claim was substantial enough to be in compliance with the statute as to the misappropriation-of-trade-secrets claim. The information provided in Yilport's notice of claim allowed the Port Authority to identify the circumstances surrounding Yilport's misappropriation-of-trade-secrets claim. The notice identified that problems began after Nass was named as executive director and alleged a link between Nass and Ports America. It stated that the Port Authority had been entertaining proposals made by third parties, including Ports America, Yilport's direct competitor. It stated that Yilport had developed a detailed master plan, "which included projections and proprietary plan for the project development which was shared with [the Port Authority]." Further, the notice stated that the Port Authority was meeting with third parties while having benefitted from years of work product produced by Yilport. Therefore, the information provided in the notice of claim was substantial enough to be in compliance with the requirements under Section 11-46-11(2), and we affirm the trial court's denial of summary judgment on this issue.

## CONCLUSION

¶58.    The trial court did not err by finding that LOI is unenforceable for failure to comply with the minutes rule. The trial court also correctly found that the minutes rule is not in conflict with the Open Meetings Act and that the minutes rule was not superseded by the Open Meetings Act.

¶59.    Because unjust enrichment is an implied-contract claim, however, we find that the trial court erred in its denial of summary judgment pertaining to the unjust-enrichment claim. Lastly, the trial court did not err by finding that Yilport complied with the MTCA's notice requirement regarding its misappropriation-of-trade-secrets claim.

¶60.    Accordingly, we affirm the trial court's grant of summary judgment as to the minutes-rule claims, reverse the trial court's denial of summary judgment regarding the unjust-enrichment claims, and affirm the trial court's denial of summary judgment as to the misappropriation-of-trade-secrets claim. We remand this case for further proceedings consistent with this opinion.

¶61.    **AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

**RANDOLPH, C.J., COLEMAN, P.J., MAXWELL, CHAMBERLIN, ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR**